BAY NEWFOUNDLAND CO., LTD., a corporation existing under the Laws of Newfoundland,

Complainant Below, Appellant,

*vs.*

WILSON & CO., INC., a corporation of the State of Delaware,

Defendant Below, Appellee.

*Supreme Court, On Appeal, April 13, 1944.*

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*James R. Morford,* of the firm of Marvel & Morford (Beekman, Bogue, Stephens & Black, of New York City, of counsel), for appellant.

*Aaron Finger,* of the firm of Richards, Layton & Fingger, for appellee.

LAYTON, Chief Justice, delivering the opinion of the court:

The complainant, the equitable owner of 1,700 of the Class A shares of the defendant corporation, sought to have declared void as to its ownership of the shares an amendment to the corporate charter by which Class A shares and all arrearages of dividends accumulated thereon were converted into common shares; to enjoin payment of dividends on the defendant's common stock until the arrearages of dividends on the Class A stock had been paid; or, in the alternative, a decree for the payment of an amount of money, based on the redemption price of the 1,700 Class A shares as of February 23, 1935, with interest. A demurrer to the bill based on acquiescence and laches was overruled. 24 *Del. Ch.* 30, 4 A. 2d 668. Upon final hearing it was held that the complainant's right to relief had been barred by its laches, and a decree was entered dismissing the bill. 26 *Del. Ch.* 270, 28 *A.* 2d 157. From the decree the complainant appealed.

The complainant corporation was formed originally to deal in investment securities of a liquid nature, particularly of stocks and bonds. Later its function was enlarged to include investments in oil and timber lands and other industrial properties. In 1934, its president had some connection,

as a limited or general partner, with the stock brokerage firm of A. M. Kidder & Co., through which firm the 1,700 Class A shares were purchased.

The defendant is engaged in the meat packing industry. Prior to February 23, 1935, it had outstanding three classes of stock: 7% cumulative preferred stock, of the par value of $100.00, upon which dividends had accumulated to the amount of nearly $6,000,000.00; Class A stock, of no par value, entitled to annual cumulative dividends of $5.00 a share, in effect a second preferred stock, upon which dividends had accumulated to an amount in excess of $6,500,-000.00; and common stock. The corporation and its subsidiaries had a surplus of more than $8,000,000.00.

On December 11, 1934, the complainant bought 500 shares of the defendant's Class A stock. On December 12, it obligated itself to purchase 700 shares of the Class A stock by what is known in stock exchange circles as a "put", and the transaction was consummated as to 200 of the shares on December 19, and as to the remainder on December 27; and on December 15 it bought 500 Class A shares. The shares were not transferred from the street name to the name of the complainant, but between February 6 and February 15, 1935, were registered on the books of the defendant in the name of A. M. Kidder & Co. The date of the annual meeting of stockholders of the defendant company was February 19, 1935. The stock transfer books for voting purposes at that election were closed on January 19, 1935, so that A. M. Kidder & Co., the registered owner of the 1,700 shares of Class A stock, could not vote them at that meeting. The complainant could not, of course, vote the shares as it was not the registered owner.

On December 14, 1934, the defendant's board of directors approved a plan of recapitalization to be submitted at the annual meeting of stockholders for consideration and action. The plan purposed to convert the 7% preferred shares with all arrearages of dividends accumulated thereon

into no-par cumulative preferred shares entitled to annual dividends of $6.00 a share, on the basis of 1.4292 shares of the new preferred stock for each share of the old; to convert the Class A shares with all arrearages of dividends accumulated thereon into common shares on the basis of five common shares for each Class A share; and to increase the number of common shares. The substance of the plan appeared in the New York evening papers on December 14, 1934, and in the morning papers of the following day, including the Wall Street Journal. The complainant admitted that it saw the news releases shortly after publication.

On January 2, 1935, the defendant mailed to each registered stockholder notice of the annual meeting of stockholders to be held on February 19, in which was stated as the purposes of the meeting the election of certain directors, and the consideration of the proposed plan of recapitalization. With the notice was a letter from the chairman of the board of directors giving a summary of the plan. It was pointed out that no dividends had ever been paid on the Class A or common shares, and as the plan contemplated the elimination of all arrearages of dividends accrued on the preferred and Class A shares, earlier payment of dividends on all shares was made possible; that it was hoped that dividend payments could be inaugurated early in 1935; and that a recommendation of an initial dividend on the common stock would be made if and when the plan should become effective. It was stated also that application would be made promptly to register the new $6.00 preferred stock and the additional shares of common stock on the New York Stock Exchange.

On January 23, 1935, the defendant mailed to all stockholders of record a further letter stating that it was desirous of having a full representation of stockholders at the annual meeting, and requesting a careful study of the plan and the sending of a proxy if the plan was considered to be in

the interests of the stockholders. On February 5, 1935, the defendant mailed to all stockholders of record, who had not responded to the previous notices, a further letter stating that the response to the proposed plan had been extremely gratifying but that it was desirable that substantially all stockholders be represented at the meeting. It was requested again that the plan be reviewed carefully, and a proxy was again requested if the plan met with approval.

The defendant admitted that it saw all of these communications shortly after they had been mailed.

The complainant made no effort to have the persons who, on January 19, 1935, were the registered holders of the certificates representing the 1,700 shares of Class A stock, vote the shares against the amendment to the defendant's certificate of incorporation, or against the plan of recapitalization, or to express disapproval of the plan. Neither did it request the registered holders of the shares not to vote them in favor of the plan or proposed amendment; nor did it take any steps whatever to prevent the record holders of the shares from voting the shares in favor of the amendment. It appears that 300 of the 1,700 shares were, in fact, voted in favor of the plan and amendment under proxies given by registered owners of the shares. The complainant made no objection to the plan by letter or otherwise before the annual meeting. It did not attend the meeting, nor send any communication indicating any objection to the plan or any intention to contest the proposed recapitalization.

The amendment to the defendant's corporate charter was approved by an overwhelming vote of the several classes of stock. Only 100 of the preferred shares, 900 of the Class A shares, and 50 of the common shares were voted against the amendment, while 163,945 preferred shares, 209,155 Class A shares and 317,279 common shares voted in favor of it.

On February 23, 1935, a certified copy of the amend-

ment was filed in the office of the Secretary of State. On February 26, a dividend of $1.50 a share was declared on the new preferred stock, and a dividend of $.125 a share was declared on the common stock, payable on June 1, 1935, to stockholders of record on May 15, 1935.

On February 25, 1935, the new $6.00 preferred stock was listed on the New York Stock Exchange. The expense incident to the exchange of certificates, the printing of new certificates and the listing of the new stock amounted to over $40,000.00.

Between February 23, 1935, and March 15, 1935, 13,900 shares of the new $6.00 preferred stock, and 129,500 shares of the common stock had changed hands on the Exchange; and during this period 98,002 shares of the old preferred stock, and 167,025 shares of Class A stock had been exchanged pursuant to the plan.

In view of the conclusion we have reached it is not necessary to make a further statement of facts, but as the court below based its decision on laches, the following brief recital is appropriate.

On March 15, 1935, counsel for the complainant, without disclosing the name of his client, wrote the defendant that the plan of recapitalization and the charter amendment were unfair and illegal, and that he had been instructed to begin legal proceedings. A conference followed, but no offer of settlement was made by either party, nor was the complainant's identity disclosed. Between February 23, 1935, and February 19, 1938, when the bill of complainant was filed, twelve dividends had been paid on the new preferred stock, aggregating nearly $6,000,000.00, and eleven dividends had been paid on the common stock amounting to more than $2,700,000.00. A. M. Kidder & Co. returned all of the checks received by them representing the dividends on the common shares into which the 1,700 Class A shares of the complainant had been converted. During the same period of time 271,000 shares of the new preferred stock

and 4,570,000 shares of the common stock were traded in on the New York Stock Exchange. On March 13, 1935, Joseph Keller and another, owners of Class A shares, filed their bill of complaint in the court below challenging the legality of the charter amendment as it affected them; and on May 24, 1935, the late Chancellor sustained a demurrer to the bill. *Keller v. Wilson & Co.*, 21 *Del. Ch.* 13, 180 *A.* 584, 585. On April 13, 1935, one Sapperstein filed a somewhat similar bill, and the Chancellor's opinion dismissing the bill was filed on December 4, 1935. *Sapperstein v. Wilson & Co.*, 21 Del. Ch. 139, 182 A. 18. In April, 1935, Tirzah P. Dunn, owner of Class A shares, brought a similar suit in the United States District Court for the District of Delaware, and on January 13, 1938, the complainant here sought leave to intervene. It was then that knowledge of the complainant's stock interest was first disclosed to the defendant.

On November 10, 1936, the decree of the Chancellor in the *Keller* case was reversed. 21 *Del. Ch.* 391, 190 *A.* 115. On February 19, 1937, a motion for reargument was denied. Beginning in April, 1937, there were conferences between a representative of the complainant and an officer of the defendant with a view of settlement of differences, but, as has been said, the complainant's identity was not disclosed. On June 14, 1937, the defendant made an offer of settlement which was met by a counter offer. Evidently the defendant was willing to buy its peace on some reasonable terms. In September, the complainant, through its representative, indicated that it would accept $90.00 a share for the cancellation of the 1,700 Class A shares, approximately three times the purchase price of the shares. On September 24, the defendant's representative wrote that the next time he was in New York perhaps he would have more time to discuss the matter in the hope that a satisfactory price for the Class A shares could be agreed upon, but that the statement that the Class A shares had a value of $90.00 could not be taken

seriously. No further conferences were held, and it was not until February 19, 1938, that the complainant filed its bill of complaint.

The court below, from a consideration of all of the facts of the case up to the time of the filing of the bill of complaint, nearly three years after the recapitalization had been effected, dismissed the bill on the ground of laches. This was a permissible view to take, and we express no dissent; but we prefer to rest our conclusion upon a different, but not wholly unrelated, basis.

In the *Keller* case we held that the contractual right of a holder of cumulative preferred shares to dividends accrued thereon through time and remaining unpaid was, as between the shareholders, a right having the nature of a debt which could not be divested under the reserved power of charter amendment against the consent of the stockholder. An attempt, however, by a corporation to revise its capital structure and thereby to cancel arrearages of dividends accumulated on its preference stock is a matter of concern to the stockholders only; and if all of the interested stockholders should consent, only an abstract question would remain. No question of public policy is involved; and it was not held in the *Keller* case, nor in any subsequent case, that the charter amendment necessary for the purpose is utterly void in any and all circumstances. *Trounstine v. Remington Rand, Inc.,* 22 Del. Ch. 122 194 *A.* 95; *Federal United Corporation v. Havender, et al.,* 24 *Del. Ch.* 318, 11 *A.* 2d 331; *Frank v. Wilson & Co., Inc.,* 24 Del. Ch. 237, 32 *A.* 2d 277. The dissenting shareholder, in such case, is in a position to assert that it is not within the power of the majority to bind him by the amendment; but his right to relief may be lost through his acquiescence, by ratification or by laches.

In the *Havender* case the defense of laches was interposed to a bill of complaint seeking to have declared void a merger of the defendant company with a wholly owned

subsidiary, as a result of which arrearages of dividends accrued on preference stock would be cancelled. The complainants expressed a dissent to the plan in somewhat irresolute terms. They did not attend the special meeting of stockholders, nor were their shares voted against the plan of merger. They did not attempt to have their shares valued as was permissible under the corporation law. *Section 61, Rev. Code,* 1935, § 2093. Their conduct in other material respects was equivocal. We were confronted with the situation in which a corporation and its assenting stockholders found themselves as a result of the *Keller* decision in the event of attack by a minority stock interest upon a plan of recapitalization or merger by which dividends accrued on preference stock were proposed to be cancelled. Not to disparage the rights of the dissenting shareholder, but to prevent an inequitable assertion of them, we with purpose said that:

"A court of equity moves upon considerations of conscience, good faith and reasonable diligence. * * * The promptness of action demanded of a stockholder objecting to the accomplishment of a proposed corporate act which, although unauthorized, is capable of ratification, is dependent in a large degree upon the effect of his delay on others; and when many persons will be affected by an act that involves a change of capital structure and a material alteration of rights attached to stock ownership, the stockholder, having knowledge of the contemplated action, owes a duty both to the corporation and to the stockholders to act with the promptness demanded by the particular circumstances."

And we concluded:

"We do not say that an objecting stockholder must, in every case, move to enjoin a proposed corporate action in order to escape the imputation of laches; but it is to be said that prompt action means unambiguous and decisive action; and it is, at the least, incumbent on such stockholder to give notice in plain and unequivocal terms that the intended invasion of rights will be contested."

These were not novel sentiments. In *Romer v. Porcelain Products, Inc.,* 23, *Del. Ch.* 52, 2 *A.* 2d 75, 77, the late Chancellor, in considering a somewhat similar case, said,

"Where action affecting numerous persons, though illegal, is susceptible of ratification, he who desires to object thereto owes some duty to the others to be diligent according as the circumstances would suggest in taking his position * * * thereto."

What was there said in a general way, was implemented and particularized in the *Havender* case; and in *Shanik v. White Sewing Machine Corp.,* 24 *Del. Ch.* 371, 19 *A.* 2*d* 831, we approved and confirmed the language of the *Havender* decision in which is the clear implication that, to attain in equity the status of a dissentient, the stockholder, having actual knowledge of an intended corporate action by which his rights of ownership will be affected, must promptly dissent. In this we can discover nothing unfair or burdensome to the stockholder. The *Havender* decision, certainly, and, probably, the *Shanik* decision were known to the complainant when this cause went to trial in the court below.

In the *Keller* case the greater part at least of the complainant's Class A shares were voted against the proposed amendment, but in that case no question other than the legality of the plan of recapitalization was raised. In the *Sapperstein* case, the complainant, prior to the meeting of stockholders, notified the defendant that, in his opinion, the plan was unfair and illegal, and that he would take whatever steps he deemed necessary to protect his interest as a Class A stockholder, if the defendant should go through with the plan. He did bring suit, but took no appeal from an adverse decree. In the *Frank* case, the complainant's Class A shares were voted against the plan, but by his acceptance of benefits under the plan, he was held to have ratified it. In the *Trounstine* case, the complainant voted his shares in opposition to the proposed plan of reclassification, but was held to have been barred from relief by his acquiescence.

For the first time we are called upon to consider the status of an objecting stockholder who, with full knowledge of a proposed plan of recapitalization, expressed no dissent,

directly or indirectly. The complainant had actual knowledge of the plan in ample time to give it careful consideration. In fact, the Chancellor found as a fair inference from the testimony that one Penick, analyst and statistician for A. M. Kidder & Co., and upon whose recommendation the complainant purchased its Class A shares, advised the complainant prior to the meeting of stockholders that the plan was unfair to holders of Class A stock. The complainant knew that by the contemplated cancellation of dividends accrued on the preferred and Class A shares earlier payment of dividends to all stockholders was made possible. As we pointed out in the *Frank* case, the Class A stockholders could expect no return on their investment in any predictable future, and that it was sacrifice of accrued dividends on the part of the preferred stockholders which made it possible, under the plan, for all stockholders to share in the available surplus and earnings. The complainant knew that the management hoped to begin dividend payments on the new preferred stock early in 1935, and that a declaration of dividends on the common stock would be advised. It knew also that the new shares contemplated by the plan would be listed on the New York Stock Exchange. That the shares would be dealt in, and, perhaps, extensively, was foreseeable. Moreover, the complainant, no novice in the field of corporate securities, knew that the listing of the new shares on the Exchange, the printing of new certificates, and the exchange of certificates among the stockholders, would involve the corporation in large expense.

In these circumstances the complainant was silent and inert. It will not do to say that it was not the registered holder of the Class A shares, and, therefore, could not vote at the meeting of stockholders; nor to say that its nominee, A. M. Kidder and Co., could not vote because of the transfer of the shares to them after the closing of the stock transfer books for voting purposes. The complainant was the true owner of the shares. The registered holder would not be

recognized in equity as entitled to vote them against its wishes. *In re Canal Const. Co.*, 21 *Del. Ch.* 155, 182 *A.* 545. It admittedly made no effort to obtain a proxy from those persons in whose names the shares were registered prior to the closing of the stock transfer books, or even to communicate with them; and as a result 300 of the 1,700 Class A shares were voted in favor of the plan. The complainant could have attended the meeting of stockholders, with or without a proxy, disclosed its stock ownership, and made known its objection to the plan. It could have addressed the defendant by letter, telegram or telephone. For whatever purpose it elected not only to stand mute but also to conceal its identity as an owner of Class A shares.

The complainant was under duty to the corporation and the stockholders to make known its dissent at a time when its objection might have had effect. *Federal United Corporation v. Havender, et al., supra.* Having elected the course of silence and inaction when it was its duty to speak or to act, equity will now withhold its aid. It is, we think, within the doctrine of acquiescence to hold that assent to a proposed corporate act will be inferred in a case where a stockholder, with full knowledge of an intended invasion of his rights and an opportunity to dissent, stands by during the progress of a proceeding which, although unauthorized, is ratifiable, and allows, without objection, his stock to be dealt with in a manner inconsistent with his rights of ownership.

The appellee contends also that the court below was without jurisdiction to grant any form of relief for the reason that the complainant's remedy at law for damages was entirely adequate. This question was not raised in the court below where the defendant was represented by other counsel. We express no opinion upon the merit of the question; it is sufficient to say that it is unnecessary to consider it here.

The decree of the court below is affirmed.