**INSITUFORM OF NORTH AMERICA, INC., a Delaware corporation, and Robert M. Leopold, Plaintiffs,**

v.

**Brian CHANDLER, James D. Krugman, Silas Spengler and Robert S. Carlson, Defendants, Counterclaim Plaintiffs,**

and

**I.P. Phillips and D.J. Buchler, as Receivers, Intervenors,**

v.

**Robert M. LEOPOLD, Jack Massar, Hershel Krasnow and Paul A. Church, Counterclaim Defendants.**

**Civ. A. No. 9205.**

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 23, 1987.
Decided: Oct. 20, 1987.

William Prickett, Michael J. Hanrahan, Joseph Grey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Daniel S. Greenfield of Parker, Chapin, Flattau & Klimpl, New York City, of counsel, for plaintiffs and counterclaim defendants, except for Paul A. Church.

R. Franklin Balotti, Jesse A. Finkelstein, Gregory V. Varallo, Joseph Bodnar of Richards, Layton & Finger, Wilmington, and Thomas J. Goodwin, of Krugman, Chapnick & Grimshaw, New Jersey, of counsel, for defendants and counterclaim plaintiffs.

Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, for intervenors.

ALLEN, Chancellor.

Pending are cross motions for summary judgment in this action brought under Section 225 of our corporation law to determine who comprises the validly constituted board of directors of Insituform of North America, Inc., a Delaware corporation. That question, in turn, rests upon a determination of the validity of action purportedly taken under the authority of Section 228 of that statute removing certain directors and designating their successors. The case, in its current posture, presents a number of legal issues of vital concern to the parties and of interest more generally as well. To appreciate the contentions of the parties surrounding each of these issues, an understanding of the somewhat complex background facts out of which this dispute arises is necessary. It is, therefore, to that task that I first turn.

I.

The corporate plaintiff ("INA") was formed as a Delaware corporation in 1981 in order to exploit in the United States a novel process developed in England by Messrs. Eric Wood, Douglas Chick and Brian Chandler. That process is a technique for the repair of cracks in sewer or water pipes which permits such repair to be effected without the need to excavate the pipes. It works by inserting a plastic lining into the buried pipes and injecting material into the cavity between the lining and the pipe wall which, as it hardens, seals all cracks. Rights to this process are regarded as valuable. Apparently INA has done quite well since its incorporation.

This process, the result of the early work of Eric Wood, an engineer, was, during the 1970s, brought along as a commercial development by Messrs. Chick, Chandler and Wood jointly. Relatively early in the course of their venture, these gentlemen came to depend upon the advice and assistance of defendant Paul Church, then a member of an accounting firm and a financial advisor to Mr. Chick. Mr. Church is apparently an energetic and talented businessman. While initially owning no interest in the Insituform process or the Isle of Man corporation set up to own that process (International Group, Ltd.), Mr. Church seems rather quickly to have assumed the role of principal "hands-on" manager of the venture.

In that capacity, Church appears to have been the active agency which caused INA to be formed and structured as it is presently. The most distinctive aspect of that structure is the existence of dual classes of

common stock. The rights, powers and privileges of each class of stock are identical except that the holders of Class B stock are, as a class, entitled to elect ⅔ of the board of directors of the Company. More specifically, Article Fourth of the Amended Certificate of Incorporation provides as follows:

> The holders of all Common stock shall have equal voting rights except in the election of Directors. The Class A shares shall be entitled to elect as a class one-third (⅓) of the members of the Board of Directors less directors elected by the holders of the Company's preferred stock. The holders of the Class B Common shares shall be entitled to elect two-thirds (⅔) of the members of the Board of Directors.

The Class A stock was underwritten publicly in the U.S. through the offices of Hershel Krasnow, an officer of a brokerage firm and a friend and associate of Mr. Church. The Class B shares were issued to Ringwood Limited, a British Virgin Islands corporation owned (through an Isle of Man corporation) by Messrs. Chick, Chandler and Wood.[1] Mr. Church, however, served from the outset as the managing director of Ringwood. Thus, as a practical matter, Mr. Church was throughout the period in a position to direct the vote of Ringwood's B stock.

This structure functioned more or less non-controversially for several years. Church served as the Chairman of the Board of INA and its Chief Executive Officer. His associate, Mr. Krasnow, also served on the board as did Mr. Wood, the inventor of the process. Krasnow and Church invited onto the board plaintiff Robert M. Leopold, who, during the last year has been named CEO and Chairman of the Company, Mr. Jack Massar, a former president of the Company. Two outside directors, Messrs. Alfred DelBello and William Ruckleshaus were elected initially by the board of directors following the 1985 annual meeting. At the June, 1986 annual meeting of stockholders, all of these individuals were all elected for a one-year term by the shareholders. The proxy card distributed by management apparently recommended the election of all seven members and did not specifically designate five of them as B directors and two as A directors.

The arrangements and relationships that permitted INA's structure to function satisfactorily for several years began to unravel in 1984. By that year, Messrs. Chandler and Wood had decided that they preferred to hold their INA B stock directly and they then suggested liquidating Ringwood and distributing its B stock holdings. Mr. Church resisted this notion. Such a step would result in the loss of control by Church over the INA B shares. Not coincidentally, as it now appears, at about this time, Mr. Church announced to the other beneficial holders of the B shares that a British Virgin Islands attorney had presented him with a claim asserted on behalf of Chimera Securities, Inc., a Liberian corporation. Church told the others that this claim arose out of some dealing by him for the account of INA or Ringwood with certain residents of Kenya. Although he urged that the claim be resisted, he recommended that 52% of the one million outstanding B shares held by Ringwood, plus some cash, be kept in Ringwood against the possibility that it became necessary to satisfy the claim. The others agreed. Thus, while Chick, Chandler and Wood sought to remove their B shares from Ringwood, Mr. Church nevertheless persuaded them to agree to a course that left the control mechanism in place, with Mr. Church still in charge of Ringwood's affairs and, thus, in continued control of INA.

---

1. Initially, the Insituform businesses were apparently owned equally by each of the three partners. By the late 1970s Ringwood was owned 50% by Mr. Chick and 25% by each of Messrs. Chandler and Wood. In 1981 Church, who continued as the active managing agent of the three, suggested that he deserved an equity participation. The partners agreed to cede to him (pro rata) a 10% share in their Insituform businesses, including Ringwood. Thus, Church, who had acted as the managing director of Ringwood, came to own beneficially a 10% interest in the INA B stock owned by Ringwood.

In addition, in connection with the distribution of 48% of the Ringwood shares, the partners signed, on December 6, 1985, a distribution agreement and a voting agreement. That agreement purported to bind those persons not to dispose of their B stock for a period of five years and to either abstain from voting that stock or to vote it in unanimity for the existing INA B directors for a similar period.

Suspicions of various sorts caused Chandler and Chick in 1986 to commission an audit by Touche Ross of Ringwood's affairs. In turn, the audit led to the filing of a suit by Chick and Chandler against Church and others, including Wood, in the High Court of Justice, Chancery Division, in London. As evidenced by opinions issued in that litigation, evidence has now been developed that suggests that the claim apparently asserted by a British Virgin Islands attorney on behalf of Chimera Securities was in fact asserted at the behest of Mr. Church himself and that Chimera Securities is simply part of a complex deception practiced by Mr. Church upon his "partners." The Chancery Division appointed two individuals to act as receivers of certain properties in connection with that litigation. On December 17, 1986, the English Court extended a receivership, earlier created, to include Ringwood's INA B shares. That order, however, did not reach the whole of Ringwood's 52% holding of the INA stock. Mr. Church had earlier brought an action in the British Virgin Islands against Ringwood claiming a personal right to 52,500 shares of B stock held by Ringwood. The British Virgin Islands court had preliminarily enjoined the transfer of that number of shares by Ringwood. Accordingly, the December, 1986 order of the English Court did not require the transfer of those shares to the receivers. The balance transferred constituted 49% of the INA B shares. Thus, through his British Virgin Island action, Mr. Church had succeeded in preventing potential control of INA, through control of a majority of the B shares, from moving into other hands. Thereafter, however, the British Virgin Islands court dissolved its preliminary order. On March 24, 1987, the English Court modified its own order to require transfer of the remaining B shares to the receivers it had appointed.

Thus, after March 24, 1987, for the first time, the power to elect a majority of the directors of INA arguably fell into the hands of someone not subject to Mr. Church's control or influence. When the board of INA met at a regular meeting on April 26, 1987, it reacted immediately to this circumstance. At that meeting, the board elected to defer the 1987 annual meeting then planned for June. It has been admitted that the board so acted because it could not be sure how the Class B shares would now be voted.

A further and more complete reaction to the perceived threat followed. First, on June 17, 1987, the board met by telephone. At that meeting, it authorized the issuance of 51,000 shares of Class B stock to plaintiff Leopold, who by this time had become Chairman of the Board of INA. The effect of this issuance was to dilute the holdings of the receivers from 52% of the outstanding B stock to slightly below 50% of that stock.

Next, at a special meeting on July 2, the board approved several by-law changes designed to create an effective veto of any board action by the two "A" directors. These by-laws did several things:

First, they required that a majority of the A directors be present before a quorum would be present and required the approval of a majority of these directors before the board could take any action.

Second, they required any newly created directorship to be filled by a majority vote of stockholders of the class entitled to elect the holder of that position and not by the vote of the directors.

Third, they created an executive committee consisting of the Chairman of the Board (Mr. Leopold) and two Class A directors.

Fourth, they gave the executive committee jurisdiction over certain matters concerning officers and the power to call board meetings and to set the date for shareholder meetings

Finally, as a permanent solution to the "problem," the board at its July 2, 1987 meeting resolved to recommend to the shareholders approval of a merger that would have the effect of eliminating the B stock. In the proposed merger between INA and a wholly-owned subsidiary, NU–INA, each of the 1,051,000 shares of B stock would be converted to 1.05 shares of NU–INA.[2] Each of the 7,889,158 outstanding shares of Class A stock would be converted into a single share of new common. The board also fixed August 27, 1987 as the date of a special meeting called to vote on this proposal.

None of these July 2 actions were publicly disclosed. When the English High Court later, on July 10, directed the receiver to vote the B shares for the existing board, including Mr. Church were he to be nominated, the court was apparently not informed of the board's July 2 action.

The various actions of the incumbent board were challenged in a litigation filed in this court by the receivers. It was claimed by the receivers that, in delaying the scheduled annual meeting and in issuing stock to Mr. Leopold, the board acted only to prevent shareholders from exercising their legitimate rights; that it did so for no proper business purpose but merely to entrench itself; and that such actions constituted a wrong. The receivers further argued that the by-law amendments and the merger itself were similarly self-seeking manipulations taken for no proper purpose but, rather, taken simply to entrench existing management.

The application for a preliminary injunction against effectuation of the proposed merger was argued on August 24, 1987. A decision granting that application was issued on August 27. *See Phillips v. Insituform of North America, Inc.,* C.A. No. 9173, Allen, C. (August 27, 1987) [Available on WESTLAW, DE–CS database]. Meanwhile, however, on August 25, counsel for the Receivers sent to the Company's principal office in Memphis, Tennessee:

1. A copy of an August 24 Order of the English High Court authorizing the Receivers to exercise powers under 8 *Del.C.* § 228 to vote 525,000 Class B shares to remove Messrs. Leopold, Massar, Church and Krasnow as directors of the Company and to designate successors to them;

2. A copy of a written consent purporting to do so;

3. A proxy signed by Charles P. Dodson purporting to authorize the Receivers to vote an additional 45,500 shares of Class B stock standing in the name of Church.[3]

Later on the 25th a consent executed by the Receivers pursuant to the Dodson proxy was received. On the next day, a consent executed by Mr. Chandler for 106,875 Class B shares was received at the Company's principal place of business. Thus, in all, consents purporting to vote 674,375 of the 1,000,000 Class B shares that are eligible to vote appear to have been cast to remove four incumbents and name replacements.[4]

The Chancery Division's direction to the receivers to vote to remove certain of the directors of the Company is especially notable in two respects. First, that court had earlier, before it learned of the steps taken by the incumbent board on July 2 designed to eliminate the special voting power of the Class B shares, specifically directed the receivers to vote for all incumbent directors. Second, that instruction was given to the receivers after the English High Court had heard and rejected argument from Mr. Wood, a beneficial owner of about 20% of Ringwood shares, that such an instruction would not only be in viola-

---

**2.** Under the terms of the proposed merger, Messrs. Church, Wood and Krasnow would not serve as directors of the successor enterprise. Church and Wood voted against this aspect of the plan and Krasnow abstained.

**3.** The Chancery Division, which has *in personam* jurisdiction over Mr. Church, entered an order authorizing Dodson to give such a proxy, apparently after Church himself failed to obey an order to do so.

**4.** Under the preliminary injunction of this court now subject to appeal, the 51,000 shares of Class B stock issued to Mr. Leopold on July 2 are not entitled to vote.

tion of the Voting Agreement, but would be imprudent. Indeed, that court specifically enjoined Mr. Wood, who has appeared in this action, from pressing those positions in this action.

The Company, purporting to act under the authority of the board elected at the 1986 annual meeting, has refused to recognize the effectiveness of the consents given by the receivers. On August 26, 1987 it filed this action seeking a judicial resolution of the conflict.

## II.

Plaintiffs—the Company itself [5] and Mr. Leopold, a stockholder, and an officer and a director elected at the 1986 meeting—assert three principal arguments in support of their position that the consents executed by the receivers are ineffective. First, they argue that Article Fourth of INA's certificate of incorporation is itself legally ineffective to create special voting rights in so-called B stock in this instance. While the intention may have been otherwise, the legal conclusion, it is urged, is inescapable that no valid class of INA stock with extraordinary voting power exists. Thus, it is argued that the consent expressed by the receivers represents far less than "the minimum number of votes that would be necessary to authorize ... action at a meeting." 8 *Del.C.* § 228(a). As explained below, plaintiffs build their argument in support of this position upon the language of Section 141(d) of our corporation statute.

Second, plaintiffs contend that if INA does have a classified board, then its directors may only be removed for cause. The terms of Section 141(k) are invoked in support of this proposition. It is then argued that neither has just cause been shown nor have proper procedures been followed (*see Campbell v. Loew's, Inc.*, Del.Ch., 134 A.2d 852 (1957), both of which are assertedly necessary to validate the purported removals in these circumstances.

Third, it is asserted that the receivers were not legally entitled to exercise a consent with respect to a majority of the B shares. Two bases mainly are urged for this position. First, it is contended that the Ringwood shares themselves are subject to the terms of the 1985 Voting Agreement and the expression of consent in these circumstances constitutes a vote that would violate the terms of that Agreement. Secondly, it is contended that under Delaware law, a nominal owner—into which category plaintiffs would place the receivers—may not validly vote shares inconsistently with the wishes of the beneficial owner. Applying this principle, plaintiffs assert that the shares of B stock owned beneficially by Messrs. Church and Wood may not be included in the calculation of shares that have consented to the action purportedly taken. When those shares are excluded, it is asserted, less than a majority of the B shares have consented to that action.

Each of these arguments has been considered. For the reasons set forth below, I conclude that each is flawed in a material respect and that the action of the receivers was valid and effective to remove Messrs. Leopold, Massar, Church and Krasnow as directors of INA and to designate their successors. Defendants' motion for summary judgment will therefore be granted and plaintiffs' motion denied.

## III.

▮ I turn first to the legal question whether Article Fourth of the INA certificate of incorporation is effective to create a right in the holders of INA stock denominated Class B common stock to elect ⅔ of the board. The relevant charter language purporting to create that right is quoted above at p. 260. The argument that that language is ineffective asserts that to be effective such a charter provision must both specify the term of office of directors to be elected by a designated class of stock and also set forth the voting rights of such directors.

The argument is plausibly based in the language of Section 141(d) of the Delaware General Corporation Law. That section

---

**5.** The standing of a corporation to act as a plaintiff in a Section 225 action has been put in issue by defendants. That issue is touched-upon below at page 270.

was enacted in two parts. The first sentence, which deals with staggered boards and explicitly authorizes them in a defined way, was first enacted as part of the original 1899 corporation law statute. *See* 21 Del.L. Ch. 273 § 20 (1899). The second and third sentences of subsection (d), which are involved in this argument, specifically treat the power, through charter provisions, to "classify" a board in a different way: to confer a special power on the holders of a particular class or series of stock to elect one or more directors. This aspect of Section 141(d) was enacted in 1974. The language of the 1974 amendment is as follows:

> The certificate of incorporation may confer upon holders of any class or series of stock the right to elect one or more directors *who shall serve for such term, and have such voting powers as shall be stated in the certificate* of incorporation. The terms of office and voting powers of the directors elected in the manner so provided in the certificate of incorporation may be greater than or less than those of any other director or class of directors. (Emphasis added.)

Plaintiffs' argument is straightforward and, they say, strengthened by its literal quality. It is that a special class of directors is *only* valid if it complies with this 1974 amendment to subsection (d) and that Article Fourth (which concededly does not state the term or voting power of directors) does not comply with the language of that subsection that is underscored above. Therefore, it is contended, there are no valid class directors and all stock is equally entitled to elect (and remove) all directors. Accordingly, the argument concludes, since the B stock represents only approximately 14% of the total voting power of all common stock, it has insufficient voting power to remove any director.

No decided case has construed the 1974 amendment to Section 141(d); nor is there much in the way of legislative history to that amendment. An evaluation of plaintiffs' argument, therefore, begins with an acknowledgment of two principal tenets of statutory interpretation. They hold, first, that where the language of a statute is clear, a court's function is only to apply that clear command and, second, that where the language chosen leaves it unclear whether it was the legislature's intent to apply the statute in circumstances of the kind presented or leaves it unclear as to how that language should be applied, then a court should place such construction on the words as will be most consistent with the legislative purpose in enacting the statute. Learned Hand said it well: "statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.1945).

The first principle recited above has, in my opinion, no application in this case. While the words of the 1974 statute are in themselves clear enough, the statute is anything but clear on the critical question: what is the consequence of not setting forth the terms of office and voting power. On that question, the statute is quite silent and, thus, we resort to the second principle that directs us to a search for the underlying legislative purpose in enacting the language involved.

That effort requires us to note first that the 1974 amendment to subsection (d) did not introduce an innovation in Delaware corporation law. Prior to that time, although there was no statute expressly authorizing the practice, it was not uncommon for corporate charters, under the general grant of Section 102(b)(1)[6] to fix cer-

---

**6.** As currently written, that section provides as follows:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> (1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the members of a non-stock corporation; if such provisions are not contrary to the laws of this State. Any provision which is required or permitted by any section of this chapter to be stated in the certificate of incorporation;

tain board positions, or a stated proportion of board seats, as being elected by a named class of stock. *See, e.g., Young v. Janas,* Del.Ch., 103 A.2d 299 (1954); *In re Farm Industries, Inc.,* Del.Ch., 196 A.2d 582, 592 (1963). Accordingly, the 1974 amendment may not sensibly be seen as intending to authorize this practice for the first time. Was the amendment intended then to restrict this pre-existing practice so that thereafter it could be validly followed only by placing the terms and the votes of such directors in the charter? This is the position for which plaintiffs must contend. While this possibility is not flatly impossible, it seems extraordinarily unlikely, given the way the language of the amendment is constructed. If the intention had been to invalidate specially elected directorships unless the certificate explicitly sets forth a term of office or voting power of such offices, one would expect the statutory language to do so directly, which it does not do.

A more fitting interpretation of the words used, in my view, ascribes to the legislature the intention to make it clear that directors elected by a class of stock might have any term or such voting rights as the certificate of incorporation might fix. While Section 102(b) quoted above arguably already authorized such provisions, the statute had not theretofore expressly acknowledged, for example, that weighted voted was permissible. *See, e.g.,* the last sentence of Section 141(b).

But there was a more specific problem that was addressed by the 1974 amendment. The pre-existing portion of Section 141(d) authorized staggered terms for directors but specifically contemplated no more than three "classes" of directors. What if a company with a staggered board containing three classes of directors had a provision in an issue of preferred stock calling for the election of certain directors by the preferred in the event of a default in payment of dividends? Such provisions were and are, of course, not uncommon. Would, upon a default, the election of such directors constitute and arguably proscribed fourth class of directors where there was already such a staggered board?

Contemporaneous and authoritative commentary tells us it was this problem that the 1974 amendment sought to answer:

The provisions of Section 141(d) which were not changed by the 1974 amendments permit the directors of a Delaware corporation to be "divided into one, two or three classes," pursuant to a charter or by-law provision, and to serve for staggered terms of three years. The amendment makes clear that directors elected pursuant to special provisions in the charter by the holders of a class or series of stock, will not constitute a proscribed fourth class whether or not their terms coincide with that of an existing class. Thus, the amendment lays to rest any concern that special voting provisions, such as those commonly seen conferring voting powers on holders of preferred shares upon a default in dividends, might run afoul of a prohibition, arguably implicit in Section 141(d), on more than three classes of directors or on a term of office of classified directors which is other than three years. But, as indicated above, the amendment goes farther than this. The second sentence states that such "terms of office and voting powers ... may be greater than or less than those of any other director or class of directors." Thus, as amended, Section 141(d) authorizes a departure from the traditional one vote per director on each and every action of the board and would sanction fractional, multiple or weighted votes for such "class or series" directors or ...

Arsht & Black, Analysis of the 1974 Amendments to the Delaware General Corporation Law, Prentice Hall Corp.Serv. p. 375, 377 (1974).

Accordingly, I conclude that it was neither the intended or the unintended effect of the 1974 amendment to invalidate certificate provisions creating class-designated directorships that do not state the term of such directorships or their voting power. In the absence of certificate provisions providing otherwise, directors, including those

designated by a special class of stock, are elected annually[7] and each director has a single vote on each matter that occasions board action.[8] To deviate from these traditional standards is permissible, but specific charter (or in the case of voting rights, by-law) language is required to do so. In the absence of provisions creating a different term or different voting power, it is, in my opinion, not the case that specially designated directorships are invalid, but rather that such directorships will have only the term—one year—and only the vote—one vote per director—that provides the common base in our law upon which other innovations have been built.

I therefore conclude that plaintiffs' argument that the INA certificate fails to create valid class-designated directorships is incorrect.

## IV.

■■■ Plaintiffs next say that, assuming the A–B structure is valid and that the allegedly removed directors were elected by the B shares, and thus could properly be removed by them, those directors have not properly been removed.[9] The argument, predicated upon Section 141(k), asserts that that section mandates that plaintiff Leopold and the others could only be removed for cause, pursuant to a fair procedure, and that such fair procedure was not afforded here.

The underscored portion of Section 141(k) provides the foundation of the argument:

> (k) Any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except as follows:
>
> (1) Unless the certificate of incorporation otherwise provides, in the case of a corporation whose board is classified as provided in subsection (d) of this section, shareholders may effect such removal only for cause; ...

---

7. *Compare* Section 211(b):
   An annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the by-laws.

8. *Compare* Section 141(b):
   The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board ... unless the certificate ... or by-laws ... require a vote of a greater number.

9. Plaintiffs do advance an independent argument to the effect that the removal of the purported B directors was ineffective because there were no B directors elected at the 1986 annual meeting. I will deal with that argument in this note. The argument is that at the 1986 annual meeting the proxy used by management did not designate specific "B" directors, but simply proposed a slate of seven incumbent directors and that all shareholders, A stock and B stock, voted for all of the nominees. Thus, it is concluded that no directors were elected especially by the B stock and that consequentially that stock has no power itself to remove any directors.

This contention is lately discovered. It seems clear that, until quite recently, all of the interested parties acted on the understanding that the A–B director structure was in place and functioning. See *e.g.,* INA's Proxy Statement for the May 13, 1985 annual shareholders' meeting at page 1 and page 5. The by-laws adopted by the INA board on July 2 only make sense on that basis; those by-laws, for example, create an executive committee comprised predominantly of A directors. It is a conventional principle of law that a party to a course of dealing may be estopped to deny the authority, office or capacity of another when that authority, etc. was recognized during the course of dealing. *See* cases cited at 31 C.J.S., Estoppel § 123 (1964). Moreover, in the prior litigation in this court, directors DelBello and Ruckleshaus—who made a joint defense with plaintiffs in this case and whom I regard as being in privity with them for these purposes—specifically identified themselves in affidavits as A directors. And, in his deposition in that case, Mr. Leopold identified himself and all other directors, other than Mr. Ruckleshaus and Mr. DelBello, as B directors. (Leopold Dep. at 243.) This court, therefore, was asked by the defendants in that action, including plaintiffs here, to decide that matter on the basis that Messrs. Ruckleshaus and Del-Bello were "A" directors. For both of these reasons, I will, therefore, decline to analyze the effect of the form of proxy on the implementation of the board structure envisioned by the certificate, finding the plaintiffs in this instance are prohibited by the doctrines of estoppel or waiver from contending that there are no specially designated directors.

\* \* \* [10]

Whenever the holders of any class or series are entitled to elect 1 or more directors by the certificate of incorporation, this subsection shall apply, in respect to the removal without cause of a director or directors so elected. [Emphasis added]

■ If these words create a right on the part of INA B directors to be immune from removal except for cause, two issues arise: whether the receivers had good cause to remove incumbent directors and whether the incumbents were accorded such procedural rights as the law may require. *See Campbell v. Loew's, Inc.*, Del.Ch., 134 A.2d 852 (1957); *Bossier v. Connell*, Del.Ch., C.A. No. 8624, Hartnett, V.C. (Nov. 12, 1986) [Available on WESTLAW, DE–CS database]. As I conclude, however, that the incumbent B directors had no immunity to removal except upon cause, these subsidiary questions may be skipped-over.

The quoted portion of Section 141(k) may be restated in three paragraphs as follows:

1. When a corporation does not have a board "classified as provided in subsection (d)," the holders of a majority of the shares entitled to vote at an election of directors may remove one or more directors with or without cause;

2. Should a corporation, however, have a board "classified as provided in subsection (d)," shareholders can effect removal only for cause; and

3. When the certificate creates specially-designated directorships "this subsection shall apply, in respect to the removal without cause of a director ...".

A confusion arises because specially-designated directors are such (since the 1974 amendment of § 141(d)) by reason of subsection (d). Thus, arguably, paragraph 2 above, which refers to boards that are "classified as provided in subsection (d)," applies to boards, like INA's, containing specially designated directorships. But such a construction would render the last sentence of subsection (k) (paragraph 3 above) meaningless: if specially-designated directorships are "classified as provided in subsection (d)" there would be no occasion (under paragraph 2 above) when the provision for "removal without cause" (under paragraph 3) would ever apply. I would have liked to explain this imperfection by referring to the fact that subsection (k)(1) was enacted before the 1974 amendments added the language to subsection (d) that causes that section to expressly treat (in addition to staggered boards) specially-designated directorships. Unhappily, I cannot as subsection (k) was itself added by the same 1974 amendments. Nevertheless, I am of the view that the phrase "classified as provided in subsection (d)" which is used in subsection (k)(1) but *not* in the last sentence of subsection (k), was meant to refer only to staggered boards (pursuant to the first sentence of subsection (d)) and not to specially-designated directorships. This construction not only avoids an interpretation that would render the last sentence of subsection (k) pointless but, equally importantly, is consistent with the principal thrust of subsection (k): to recognize the power of shareholders to remove directors without justification unless, because of the existence of cumulative voting or staggered boards, protection of minority voting interests is thought to require such justification. *Compare Essential Enterprises Corp. v. Automatic Steel Products, Inc.*, Del.Ch., 159 A.2d 288 (1960) *with Everett v. Transnation Develop. Corp.*, Del.Ch., 267 A.2d 627 (1970).

■ Accordingly, I conclude that the receivers, as holders of a majority of the B stock, had the power, without cause, to remove from office directors designated by the B stock. I also conclude that when shareholders have the power to remove a director without cause, their subjective motivation in exercising that power is irrelevant; thus plaintiff's argument that certain of the allegedly removed directors were, in reality, removed for cause (without required procedural steps) is itself irrelevant.

### V.

I turn then finally to the arguments that the consent expressed by the receivers

10. Deleted is subparagraph (k)(2) which treats situations where cumulative voting obtains.

should be deemed to be without effect (1) because it is, allegedly, in violation of the Voting Agreement entered into by Messrs. Chick, Chandler, Wood and Church and (2) because it represents an action warmly opposed by some of the beneficial owners of the stock in question. These points are legally independent and will thus be treated separately.

## A.

█ The Voting Agreement argument raises a number of questions. Those issues relate to the validity of the agreement (it is claimed in the Chancery Division action that the Voting Agreement was fraudulently induced by Mr. Church); to its meaning and effect in a consent setting; to whether the obligations it creates extend to shares held by Ringwood, a non-signatory; to the appropriate judicial remedy, in the circumstances presented, if the consents represent a breach of the agreement; and, finally, to the effect, if any, of the fact that the consents were expressed pursuant to judicial order after a hearing in which the court had *in personam* jurisdiction over all of the signatories to the Voting Agreement and gave each an opportunity to be heard. Happily, as I view the matter, most of these questions need not be taken up, as I conclude that the parties advancing the claim that the expression of consent by the receivers violated the Voting Agreement, have no rights of any kind under the Voting Agreement and no standing to enforce duties that it may create.

The Voting Agreement has four operative provisions. It creates the following obligations in "Shareholders" (defined as "those four persons who have executed this agreement"), which may be summarized as follows:

1. Each Shareholder agrees that he will not sell, assign, etc. any or all of the shares of INA for a period of 4 years;

2. Each agrees that "he will at all meetings of members of INA for a period of four years ... vote for the appointment of the Board of Directors of INA existing at the date of the Agreement. [And that] All other resolutions requiring consent of Shareholders ... shall be voted on by each ... in a manner agreed in writing by all four Shareholders." In the absence of agreement, each is obligated to refrain from voting;

3. Each agrees that for a period of ten years any sales that may be permitted shall be through a broker on the market and that each Shareholder shall have a right of first refusal; and

4. Each agrees for a period of ten years not to convert his B stock to A stock without written consent of other Shareholders.

The Voting Agreement was signed by Wood, Church, Chandler and Elstree, Ltd. (an entity controlled by Mr. Chick, the fourth of the Ringwood "partners"). It was not signed by Ringwood or by either of the plaintiffs.

Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party. *See generally* 2 *Williston on Contracts* § 356 (1959); 4 *Corbin on Contracts* §§ 772, 774 (1951). The developed law has characterized persons who, while not being parties to a contract, nonetheless benefit from its performance in one of three ways: as donee beneficiaries, as creditor beneficiaries and as incidental beneficiaries. *Restatement of Contracts* § 133 (1932); *see generally Restatement of Contracts (Second)* Sec. 302 (1979). It is universally recognized that where it is the intention of the promisee to secure performance of the promised act for the benefit of another, either as a gift or in satisfaction or partial satisfaction of an obligation to that person, and the promisee makes a valid contract to do so, then such third person has an enforceable right under that contract to require the promisor to perform or respond in damages. *See generally Blair v. Anderson*, Del.Supr., 325 A.2d 94 (1974); *Astle v. Wenke*, Del.Supr., 297 A.2d 45 (1972); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, Del.Super., 312 A.2d 322 (1973); *Insurance Company of North America v. Waterhouse*, Del.Super., 424

A.2d 675 (1980). If, however, it was not the promisee's intention to confer direct benefits upon a third person, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then such third party beneficiary will be held to have no enforceable rights under the contract. This is, of course, highly conventional learning; application of these broad statements, however, can give rise to murky ambiguities.

In resolving the question whether either plaintiff or any third-party defendant in this action has rights under the Voting Agreement, I first note that Mr. Church, a signatory to that agreement and third-party defendant, has not appeared in this suit. I do not therefore consider his position. Secondly, I note that Messrs. Leopold, Massar and Krasnow who do assert such rights are not signatories to the Voting Agreement, but were directors "existing at the date of this Agreement," and thus surely were potentially benefitted by performance of the promises therein contained. The legal question on this motion is then, did the promisees (there were four promisees, of course) at the time of entering into the Voting Agreement utilize language that reflects an intention to create *rights in the then existing board* of INA *to continued tenure* for the term of Voting Agreement? That is, did it create such rights enforceable by incumbent board members without regard to the future desires of the promisees and, indeed, even against their wishes? This would be a startling reading of a stockholders' voting agreement, but would arguably be the effect if the incumbent board is taken to have rights arising out of the agreement. *See Restatement of Contracts (Second)* § 311(3) (1979).

In addressing the question whether the incumbent board has rights under the Stockholders' Voting Agreement, we might begin with a statement dealing with the distinction between third parties with enforceable rights and those with none. The authority is Professor Corbin:

> ... [S]ince it is certain that not every sort of beneficiary has a legal right, it is necessary to find some basis for distinguishing those who have from those who

have not. The concepts of "gift" and "debt" are useful for this purpose. *As the law has been developed in the decisions up to date, it is possible to say that the only third parties who have legal rights are the donees and the creditors of the promisee.* If in buying the promise the promisee expresses an intent that some third party shall receive either the security of the executory promise or the benefit of performance as a gift, that party is a donee of either the contract right or of the promised performance or both. If, on the other hand, the promisee's expressed intent is that some third party shall receive the performance in satisfaction and discharge of some actual or supposed duty or liability of the promisee, the third party is a creditor beneficiary. *All others who may in some way be benefited by performance have no rights and are called incidental beneficiaries.* This term is a sort of omnium gatherum and is not very clearly descriptive; but it is used in default of a better. It can be defined only by a statement that negatives the existence of gift and debt: *Incidental beneficiaries are all those who are not donees or creditors of the promisee.* (Emphasis added)

4 *Corbin on Contracts* § 779C at pp. 40–41 (1951).

The 1985 incumbents on the INA board were not creditors of the signatories to the Voting Agreement nor were they the objects of the signatories generosity; in entering the Voting Agreement, there certainly was here no motivation to make a gift to the incumbent directors. As a matter of deduction then, it may be said that the 1985 directors were "incidental" beneficiaries of the Voting Agreement as to whom, under the conventional doctrine, no rights would attach. *Restatement Contracts (Second)* Sec. 315 (1979).

This categorical form of analysis, however, is not altogether satisfying here, perhaps because it is difficult to call the incumbent directors "incidentally" involved in the achievement of the Voting Agreement's purpose. If, as seems apparent, that purpose was to secure benefits *to the*

*signatories* by assuring both continuation of joint control over INA and the continuation of the existing board for a period of four years, then the effect upon the existing board cannot be called merely incidental. It would more correctly be called instrumental. That is, *the effect on the incumbent board, while a benefit to its members and intended, was merely a means through which the benefit that motivated the contract was sought to be achieved for the signatories.* Where this is the case, the third parties—even though not merely incidental to the contract in the sense of being collateral or peripheral to the achievement of the contract's purpose—take no rights under the contract. They are legally incidental to the contract since they are merely an instrumental technique for the achievement of the contract's purpose; the fact that the effect upon them of the contract's performance would constitute a benefit to them or not is irrelevant to the achievement of that purpose.

■ In order for third party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon third parties that was intended, but the conferring of a *beneficial* effect on such third party—whether it be a creditor of the promisee or an object of his or her generosity—should be a material part of the contract's purpose. Here, circumstances surrounding the execution of the Voting Agreement, as disclosed by the undisputed portion of the record, and the clear meaning of the language chosen in the agreement, requires the conclusion that any effect that performance of the agreement would have on the incumbent board, whether beneficial or not, or intended or not, was merely instrumental to achieve-

ment of the contract's purpose and was, legally, incidental to the contract. I therefore conclude that the appearing non-signatories directors to that agreement have no rights under the agreement and no standing to assert that the consents expressed by the receivers (or by Mr. Chandler) violated the terms of that agreement.

■ Is the corporate plaintiff in any different posture than the incumbent board members? Putting to one side the more fundamental problems concerning INA's standing to bring this action itself,[11] I cannot conclude that the Voting Agreement confers upon INA rights, against its shareholders, to require such shareholders to vote for the incumbent board. The reasons set forth above apply to INA as well. In addition, the policy expressed in our corporation law in Section 160(c) would require a very clear intent to create such a right before a court would recognize it.[12]

### B.

■ Even assuming that it was the mutual intent of the signatories of the Voting Agreement (as co-promisees) to confer enforceable rights upon members of the incumbent board or upon INA itself, such rights would be unavailing against the receivers, since Ringwood was not a signatory to that agreement and, in my opinion, is not bound by it. The language of the contract itself makes that conclusion apparent. The Voting Agreement recites that Ringwood had that day entered a Distribution Agreement by which a portion of its INA stockholders would be distributed to "the shareholders," yet the Voting Agreement does not join Ringwood as a signatory to it and indeed recites that "[t]his

**11.** Section 225 confers standing to bring the action it authorizes upon "any stockholder or director or any member of any corporation without capital stock." Noticeably absent from this listing of parties with standing to institute such an action is the corporation itself or an officer of it. No case has been cited extending rights to bring such action to such persons. I need *not*, however, express any opinion at this time on the question of the corporation's standing to bring this action.

**12.** Speaking very generally, § 160(c) prevents a corporation from voting its own stock. It is a provision designed to prevent those in control of a corporation from using corporate resources to perpetuate themselves in office. *See Speiser v. Baker,* Del.Ch., 525 A.2d 1001 (1987). A harm similar to that which § 160(c) seeks to guard against is threatened where an incumbent board may exercise its control over a corporation to cause the corporation to seek to enforce a contract such as the Voting Agreement which secures the tenure of the incumbent board.

Agreement is ... by and among those four persons who have executed this agreement ... (... "the Shareholders")."

Plaintiff urges that the real purpose of the Voting Agreement was to control Church and that such purpose could not be met unless Ringwood's shares, which Mr. Church then continued to control, were intended to be governed by the Agreement. Whatever the real purpose of the Agreement may have been (and one is entitled to suspect that it was a device designed by Mr. Church (1) to assure that he would maintain a veto on shares that slipped out of the Ringwood's control and (2) to assure the continued tenure of the incumbent board of which he was chairman), under the accepted objective theory of contract interpretation (*see "Industrial America," Inc. v. Fulton Industries, Inc.*, Del.Supr., 285 A.2d 412, 415 (1971); *Leeds v. First Allied Connecticut Corp.*, Del.Ch., 521 A.2d 1095, 1097 (1986)) the conclusion seems inescapable that this contract cannot be construed as intending to bind Ringwood. Such an intention is flatly inconsistent with the unambiguous words used in the Agreement. Thus, there is no occasion to convene an evidentiary hearing to explore the subjective mind-sets of the signatories. *Compare Klair v. Reese*, Del. Supr., 531 A.2d 219 (1987) (where words of a contract are ambiguous, it was error not to take testimony on the circumstances surrounding the making of the agreement).

C.

Finally, plaintiffs claim that the voting of Ringwood's shares to remove Messrs. Church, Leopold, Massar and Krasnow is contrary to the wishes of Mr. Wood, the uncontested beneficial owner of 22½% of the Ringwood holding and, contrary to the wishes of Mr. Church, the claimant to a 10% interest in such holding. I accept that assertion. They go on to argue that under Delaware law shares may not validly be voted by a nominal or bare legal owner against the wishes of the beneficial owner. They conclude, therefore, that that portion of the Receivers vote should not be counted and that therefore less than 50% of the B stock was validly "voted" to remove the directors in question.

In support of this argument, plaintiffs cite Chancellor Wolcott's opinion in *In re Canal Construction Company*, Del.Ch., 182 A. 545 (1936) in which it was held, in an election review proceeding, that votes cast by a registered owner would not be counted where the beneficial owner of the stock had indicated a desire to have the stock voted differently. In that case, the administrator of an estate had distributed shares of stock to distributees and had closed the estate; some of the takers, however, had not caused the stock distributed to them to be transferred into their names. The former administrator then caused the estate to be re-opened for the sole purpose of allowing him to vote all of the stock formerly owned by the estate and still registered in its name. In these circumstances, the court held that the indisputable owners of the stock in question would have had a claim for an injunction against the voting of stock by the erstwhile administrator and the corporation would not be required to recognize the vote of the administration even though he remained the registered owner of the stock. In a later case, our Supreme Court approved the Chancellor's opinion. *See Bay Newfoundland Co., Ltd. v. Wilson & Co., Inc.*, Del.Supr., 37 A.2d 59, 63 (1944).

Plaintiffs generalize from *In re Canal Construction Company* holding, the proposition that a legal owner may not validly vote corporate stock in opposition to the position of the beneficial owner. So stated, the generalization is obviously overly-broad. Trustees are not under a general obligation to vote stock as directed by trust beneficiaries (*see* 3 *Scott on Trusts* Sec. 193.1 (1967 ed.)) nor are corporations typically free to disregard votes of legal owners of corporate stock because beneficial owners may have voted differently. It is not required, for example, for pension funds or other pooled investment funds to canvass investors before exercising votes appurtenant to corporate stock had as investment. What distinguishes *Canal Construction* is that, there, the person who

was the registered owner of the company's stock had no claim to ownership of any kind—legal or beneficial—to the stock he sought to vote. The estate had been closed and all of its assets distributed.

So understood, *Canal Construction* has little to do with the voting of stock by Ringwood or by its court-appointed receivers. First, Ringwood does own 52% of the B stock and is under no obligation to poll its shareholders in voting that stock. Its receivers are in no different position. Secondly, were the receivers to poll the Ringwood shareholders, it is apparently the case that those holding a majority of shares would favor the consent action (with only Mr. Wood and Mr. Church apparently feeling otherwise). Thirdly, in directing the receivers' action, the High Court afforded each of the Ringwood shareholders an opportunity to be heard and presumably considered a consent that would not have involved the proportion of Ringwood shares beneficially owned by Mr. Wood. Fourthly, given Mr. Church's failure to appear in this court and his apparent failure to comply with orders in the English litigation, I do not consider him eligible to make any claim to set aside the consents and plaintiffs cannot bring greater authority to this claim than would he himself. Therefore, given the view expressed above on the Voting Agreement, the effect of the Dodson proxy and the Chandler consent, even if Wood's beneficial share of the Ringwood holding were not included in the consent calculation, more than the required vote would be expressed in favor of removal.

Each of these reasons supplies an independent reason for rejecting the argument that the action by consent was ineffective because it was inconsistent with the view of Mr. Wood and Mr. Church.

For the foregoing reasons plaintiffs motion for summary judgment will be denied and defendants' motion for summary judgment will be granted. A form of order shall be submitted by defendants on notice.