Stuart **AGRANOFF**, L. David **Callaway III**, and **EMS Corp.**, Plaintiffs,

v.

Edward M. **MILLER** and William A. **De Lorenzo**, Defendants.

Civil Action No. 16795.

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 31, 1998.
Decided: Jan. 5, 1999.
Revised: Jan. 8, 1999.

Joel E. Friedlander, Bouchard, Friedlander & Maloneyhuss, Wilmington, Delaware; of Counsel: Stuart L. Shapiro, Shapiro & Allen, New York City, for Plaintiffs.

Robert K. Payson, Peter J. Walsh, Brian C. Ralston, Potter, Anderson & Corroon, Wilmington, Delaware, for Defendants.

## OPINION

STRINE, Vice Chancellor.

Before me now in this action brought pursuant to 8 *Del. C.* § 225 is a motion for judgment on the pleadings. In this action, the plaintiffs EMS Corp. ("EMS"), Stuart Agranoff, and L. David Callaway III challenge a consent executed by defendant Edward M. Miller purporting to remove Agranoff and Callaway as directors of EMS. Miller and his co-defendant William A. De Lorenzo argue that: 1) EMS lacks standing to bring this action; 2) Agranoff and Calloway lack standing to rely upon a shareholders' agreement to which EMS, but not they, are a party as the basis for resisting their removal from office by Miller; and 3) alternatively, that the shareholders' agreement is clear on its face, is incorporated in the pleadings, and entitles them to judgment as a matter of law. This matter is scheduled for hearing in two weeks and therefore I have endeavored to provide the parties with my disposition of this motion as promptly as possible.

In this opinion, I deny defendants' motion. While EMS does not claim standing to bring an action under 8 *Del. C.* § 225, I find that the individual plaintiffs may have standing to assert EMS' contractual rights in support of their claim to office. Moreover, I do not believe that the shareholders' agreement unambiguously entitles the defendants to a judgment as a matter of law.

### I. *Background* [1]

Plaintiff EMS is a Delaware corporation with its principal office in Burlingame, Cal-

---

**1.** All facts are drawn from the verified complaint or the attachments thereto.

ifornia. It is a holding company whose principal asset is a 62% share in Express Messenger Systems, Inc. ("Express"), a Minnesota corporation. Express is in the business of same day and overnight delivery service. Three of the five directors on the Express board are designated by EMS.

Up until November 6, 1998, plaintiffs Agranoff and Callaway constituted two of the three directors of EMS. Callaway was also the President and Chief Executive Officer of EMS, as well as Chairman and a director of Express. Agranoff was also a director of Express.

On November 6, 1998, defendant Miller executed a written consent removing Agranoff and Callaway from their offices as EMS directors, and electing himself as director and Chairman and defendant De Lorenzo as director. By this action, Miller effectively assumed management control of EMS from Agranoff and Callaway. Thereafter, Miller removed Callaway and Agranoff from the Express board and excluded them from management of either company. In December, this court entered a status quo order governing the operations of EMS and Express until this matter could be finally adjudicated.

Agranoff and Callaway claim that their removal at Miller's hand was ineffective and unlawful because Miller obtained his shares in EMS in violation of a 1987 shareholders' agreement to which EMS was a party (the "1987 Agreement"), which is attached as Exhibit A to the verified complaint.

The 1987 Agreement was signed by all EMS stockholders. Sections 4 .6 and 4.7 of that Agreement provide EMS, and then all non-selling stockholders if EMS declines, rights of first refusal with respect to any EMS shares or warrants to purchase shares offered for sale by EMS stock or warrant holders. These provisions state:

> The EMS Selling Shareholder shall give written notice to EMS of the terms and conditions upon which the Offered EMS Shares are offered to EMS (the "Initial EMS Sales Notice"). Such terms and conditions shall provide that the purchase price shall be payable in cash. In addition, should the EMS Selling Shareholder have received a bona fide third party offer for the offered EMS Shares it shall also give written notice to EMS, the Non–Selling Shareholders and Air Canada of such offer and provide such persons with a true, exact and complete copy thereof.
>
> Should the Offered EMS Shares not be purchased by EMS within thirty (30) days of the initial EMS Sales Notice, the EMS Selling Shareholder shall offer the Offered EMS Shares to the other EMS shareholders and BT, as holder of the Stock Purchase Warrant (collectively the "EMS Non–Selling Shareholders") by delivery to each of them of written notice setting forth the terms and conditions of such offer (the "Subsequent EMS Sales Notice"), which terms and conditions shall be identical to those set forth in the Initial EMS Sales Notice. A duplicate original of the Subsequent EMS Sales Notice, together with all documents attached thereto, shall be given to Air Canada within forty-eight (48) hours of the giving of the Subsequent EMS Sale Notice to the EMS Non–Selling Shareholders. The EMS Non–Selling Shareholders shall have the right to acquire all the Offered EMS Shares within thirty (30) days of the giving of the Subsequent EMS Sale Notice upon the terms and conditions stipulated therein . . .

Plaintiffs contend that the 1987 Agreement was violated when Miller (and certain trusts he controls) purchased shares and warrants to purchase shares of EMS in a transaction with shareholders who are parties to that Agreement. Miller's purchases, after exercise of the warrants, gave him control over 64% of EMS' shares.

According to plaintiffs, EMS was not offered the opportunity to purchase these warrants and shares on the same terms as Miller. Therefore, they say the 1987

Agreement was violated and Miller is attempting to assert control over a corporation whose shares he owns as a direct result of a breach of that same corporation's contractual rights.

Moreover, they claim that Miller obtained his shares with full knowledge of the 1987 Agreement, because that Agreement provides in § 12.1 that:

> The certificates for shares issued or to be issued by the Corporation shall bear the following legend:
>
>> "The transfer of the Shares represented by this certificate is subject to the provisions of and restrictions on transfers set forth in the Articles of the Corporation and the Shareholders Agreement dated as of August 14, 1987 (as amended by agreements dated as of July 31, 1990 and September 1, 1991) and may only be dealt with in accordance with the provisions of the Articles and the said Agreement (as amended). Copies of the Articles and of the said Agreement (as amended) may be obtained from the Secretary of the Corporation."

This dispute turns largely on the parties' disparate views regarding whether the 1987 Agreement was in effect at the time Miller obtained his EMS shares. Plaintiffs contend it was. Defendants say it wasn't.

## A. *Plaintiffs' Contractual Argument*

For their part, the plaintiffs argue that the 1987 Agreement was in full force and effect at the time Miller obtained his shares because § 14.10 of the Agreement, adopted by a November 22, 1991 amendment, provides:

> This agreement shall automatically terminate and be of no further force and effect upon the tenth anniversary of the effective date hereof unless a longer period is permitted pursuant to applicable law or extended by the parties hereto in accordance with applicable law.

The 1991 amendment to the 1987 Agreement also replaced § 14.9 of the Agreement. The effect of that amendment was to replace a provision stating that the 1987 Agreement was governed by Canadian law with a provision stating that the Agreement was governed by Delaware law.

Although the effective date set forth in the Agreement is August 14, 1987, according to plaintiffs Delaware law provides no restriction on the length of an agreement granting a right of first refusal with respect to the sale of corporate stock. As a result, "a longer period is permitted pursuant to applicable law" and therefore the 1987 Agreement and §§ 4.6 and 4.7 remain in effect.

## B. *Defendants' Contractual Argument*

For their part, the defendants claim that the 1987 Agreement expired no later than August 14, 1997 and as early as November 21, 1994. In support of this argument, they rely upon the existence of a 1984 agreement (the "1984 Agreement") among the stockholders of EMS (then BGD Corp.), which they contend was incorporated expressly into the 1987 Agreement.

The 1984 Agreement was a voting agreement, which included provisions directing the manner in which EMS common stock was to be voted (e.g., by providing that the parties must vote for particular directors and to maintain a certain number of directors). Section 10 of the 1984 Agreement sets forth the term of the Agreement and states that it would remain in effect for ten years. The 1984 Agreement is governed by Delaware law.

The defendants contend that § 10 of the 1984 Agreement sets forth the effective term of the 1987 Agreement, because the 1984 Agreement was attached to the 1987 Agreement as Schedule 4.1.1 thereof and because § 1.1 of the 1987 Agreement states:

> "This Agreement", "these presents", "herein", "hereby", "hereunder", "hereof" and similar expressions refer collectively to this Agreement and the accompanying schedules and include any and every deed and instrument which is sup-

plementary or ancillary hereto or in implementation hereof, the whole as same may be amended or supplemented from time to time.

The defendants' counter-syllogism flows from this provision and goes as follows. The 1984 Agreement is a voting agreement. The 1987 Agreement incorporated the 1984 Agreement and therefore is a voting agreement. Under Delaware law as it existed at the relevant time, no voting agreement could exist for a duration of more than 10 years, unless extended by the parties "within 2 years prior to the time of the expiration of such agreement." 8 *Del. C.* § 218(c) (as it existed before amendment effective July 1, 1994).

As a result, the 1984 Agreement—and therefore the 1987 Agreement—could only have been extended by an amendment executed "within 2 years prior" to November 21, 1994. Since the 1991 amendment was executed prior to that time, it was ineffective as a matter of law. Thus, the 1984 Agreement and the 1987 Agreement both expired on November 21, 1994.

Since the 1987 Agreement containing EMS' right of first refusal had expired four years before, the stockholders who sold to Miller were under no contractual obligation to offer their shares to EMS first. Hence, Miller's ownership of 64% of EMS and therefore his removal of Agranoff and Callaway is proper.[2] Under this construction, defendants claim that they are entitled to judgment on the pleadings.

## II. *Legal Analysis*

In determining this motion under Chancery Court Rule 12(c), I must view the "facts pleaded and the inferences from such facts in a light most favorable to the non-moving party." *Desert Equities v. Morgan Stanley Leveraged Equity Fund II, L.P.*, Del.Supr., 624 A.2d 1199, 1205 (1993). "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the mov-

ant is entitled to judgment as a matter of law." *Id.*

Chancery Court Rule 10(c) provides that a "copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Plaintiffs attached the 1987 Agreement and the 1991 Amendment to the verified complaint as Exhibits A and B. In response, defendants have offered the 1984 Agreement and the other agreements attached as schedules to the 1987 Agreement. Given that these agreements were schedules to the 1987 Agreement, which was incorporated into plaintiffs' pleading, I will consider them in ruling upon this motion. *See Lewis v. Straetz*, Del. Ch., C.A. No. 7859, 1986 WL 2252, mem. op. at *3–4, Hartnett, V.C. (Feb. 12, 1986) (considering defendants' exhibits which were copies of documents referenced in plaintiff's complaint).

### A. *Standing of EMS As Plaintiff*

Defendants argue that EMS has no right to bring an action under 8 *Del. C.* § 225, which provides in pertinent part that "[u]pon application of any stockholder or director, or any officer whose title to office is contested . . . the Court of Chancery may hear and determine the validity of any election of any director . . . of any corporation." To my knowledge, neither this Court nor the Delaware Supreme Court has passed upon the question of whether a corporation whose leadership is in doubt may bring a § 225 action. *See Insituform of North America v. Chandler*, Del. Ch., 534 A.2d 257, 270 n. 11 (1987) (refusing to rule on issue, but noting that "[n]oticeably absent from this listing of parties with standing to institute such an action is the corporation itself").

I need not pass upon this issue, because plaintiffs have dropped any contention that EMS is present as "a party asserting a statutory right to determine the composition of the board of directors of EMS." (Pls.' Ans. Br. at 9, n. 1) Rather, they

---

**2.** Defendants offer two other alternative arguments in support of their motion which I need

not address at this time, given my disposition of defendants' central argument.

contend that EMS is present "as a nominal plaintiff bearing contractual rights." *Id.* This concession is significant because it means that if Agranoff and Callaway lack standing to rely upon the 1987 Agreement as a basis for continuing in office, then defendants are entitled to prevail on their motion. With that preliminary issue clarified, I now turn to the defendants' attack on the standing of the individual plaintiffs.

B. *Agranoff's and Callaway's Standing To Rely Upon the 1987 Agreement*

■ Neither Agranoff nor Callaway is a party to the 1987 Agreement. Neither is a stockholder of EMS. For those reasons, defendants contend that neither may assert the 1987 Agreement as a basis for claiming that they have been wrongfully removed from their positions as directors of EMS.

In support of this argument, the defendants principally rely upon the *Insituform* decision. In that case, a voting agreement existed. The two plaintiffs, Insituform and Leopold, a removed director, brought a § 225 action alleging, among other things, that Leopold had been removed from the Insituform board in violation of a voting agreement which existed among four shareholders of another corporation, Ringwood Limited. Neither Insituform nor Leopold were signatories to the voting agreement.

Because Leopold and Insituform were strangers to the voting agreement, Chancellor Allen analyzed whether they were third-party beneficiaries. While finding that Leopold would have potentially benefited from adherence to the agreement because he would have maintained his director position, Chancellor Allen concluded that this benefit to Leopold was purely instrumental to achieving the contracting parties' purpose of assuring that the parties maintained joint control over Insituform. 534 A.2d at 269–70. Since the benefit to Leopold was instrumental and not a material purpose of the contract, Chancellor Allen held that he was not a third-party beneficiary to the contract. *Id.* As such, Leopold had no standing to rely upon the

contract in support of his claim to office. *Id.*

The Chancellor held that Insituform also lacked standing, since he could not conclude that the agreement conferred rights upon Insituform to require the contracting parties to vote their shares "for the incumbent board." *Id.* In support of this conclusion, he noted that very clear evidence of an intent to confer such rights was necessary, in view of the State's public policy as set forth in 8 *Del. C.* § 160(c), which generally prevents corporations from voting their own stock. *Id.* at 270 & n. 12.

If EMS were not a party to the 1987 Agreement, I would agree with the defendants that—in accordance with the reasoning articulated in *Insituform*—Agranoff and Callaway lacked standing to rely upon that 1987 Agreement in support of this action. However, EMS, unlike the corporation in *Insituform,* is a party to the 1987 Agreement. Agranoff and Callaway are not claiming to be third-party beneficiaries of that Agreement; they, as the persons who would have been a majority of the directors of EMS but for their removal by Miller, rely upon EMS' direct interest in the Agreement. I believe that distinction is important and requires me to proceed with caution.

Under Delaware law, EMS was entitled to sign a contract giving it the right to repurchase shares of its own stock on a "first refusal" basis. 8 *Del. C.* § 160(a). *Compare Insituform,* 534 A.2d at 270 (in determining that a corporation was not a beneficiary of a voting agreement, noting that corporations cannot ordinarily vote stock). The decision as to whether to exercise such a contractual right belongs to its board of directors. 8 *Del. C.* § 141(a). Absent Miller's removal of them, Agranoff and Callaway would have participated in any decisions regarding EMS' exercise of these rights as directors.

Furthermore, absent Miller's removal of them, defendants concede that Agranoff and Callaway, as a majority of the di-

rectors of EMS, could have authorized EMS to file a lawsuit seeking enforcement of the 1987 Agreement. They were not able to do so because Miller purchased his shares from signatories to the 1987 Agreement who did not offer them for purchase to EMS first and who did not give EMS notice that they intended to sell the shares without offering them to EMS first. Whether or not this constituted a breach of EMS' contractual rights might never be adjudicated if Agranoff and Callaway are denied standing here, because it is, I daresay, unlikely that Miller will cause EMS to file such a claim seeking to undo a transaction which gave him control.

Such a holding would vitiate EMS' contractual claim on the theory that: the alleged breach of EMS' contractual rights gave a party to the breach control of the EMS board; that the change of control resulted in the removal of the incumbent board, thereby extinguishing the incumbent board's right to assert EMS' contractual rights; and that the only persons with the right to assert EMS' rights now are the members who took over as a result of the alleged breach. Put simply, Miller's theory is: I took control, therefore I alone have standing to assert EMS' claim that the transaction in which I took control breached the corporation's contractual rights and is void against it.

I find this theory somewhat troubling as a matter of public policy. Directors suing to retain office using § 225 often rely upon corporate charter and by-law provisions designed to benefit the corporation and its stockholders, not the directors *qua* directors. I see little difference between granting directors standing to insist that the corporation's governing instruments be followed in the election context and granting directors the right to claim that they were removed from office by consents executed as a result of a breach of the corporation's contractual rights. In the case of either type of claim, the § 225 remedy should exist to ensure that the reins of corporate control have not been taken by wrongful means, not for the benefit of those seeking restoration as directors, but for the benefit of the corporation and its shareholders.

On the other hand, I am equally troubled by the notion that plaintiff directors without stockholder status may rely upon the corporation's contractual rights to retain their offices in the absence of evidence that their attempt to retain office is motivated by a genuine desire to protect the corporation and its stockholders—not to protect their personal interests. In this regard, defendants have bolstered their argument with assertions of fact outside the pleadings and unsupported by record evidence. These include the purported fact that 16 of the 17 stockholders of EMS sold to Miller. Therefore, defendants claim that enabling the plaintiffs to assert EMS' rights would frustrate the will of the parties to the 1987 Agreement who have, by their sale to Miller, made him the majority stockholder.

These facts outside the pleadings do not persuade me that I should deny plaintiffs' standing to rely upon the 1987 Agreement at this time. For one thing, I cannot consider them on this motion. And even if I could, Miller concedes that he does not own all of EMS. Other stockholders own 36% of the company, although the parties have not shed any light on their identity. Important to me is the fact that I have no basis to determine whether such holder(s) are aware of this proceeding or of the sales transaction in which Miller obtained control.

Moreover, although there is nothing in the pleadings on this point, the 1987 Agreement could serve valid corporate interests. For example, one of the purposes of the 1987 Agreement's provision giving EMS first refusal rights might have been to enable all parties to the Agreement to benefit from and share any control premium. By providing an opportunity to EMS to purchase any shares held by the parties, the 1987 Agreement might have provided such protection to all parties by enabling management to consider buying back all the stock of EMS in a management buy-

out in the event that a majority of the shares held by parties to that Agreement were offered for sale, or to offer other holders of EMS stock the opportunity to sell their stock to EMS on the same terms as proposed by those wishing to sell. Such corporate action could be undertaken by EMS' board of directors consistent with its fiduciary duties in order to maximize shareholder value. *See Credit Lyonnais Bank Nederland, N.V.,* Del. Ch., C.A. No. 12150, 1991 WL 277613, at *2, Allen, C. (Dec. 30, 1991) (noting that management or third-party LBOs "can enhance efficiency and promote value creation"). Other possible purposes might be preferred by plaintiffs later in this proceeding.

On this motion for judgment on the pleadings, I am reluctant to presume that no valid corporate purpose exists or to presume that the plaintiffs would breach their fiduciary duties in responding to any offer to sell if restored to their positions as EMS directors upon a finding that EMS was entitled to buy back its shares pursuant to the 1987 Agreement. I am also reluctant to formulate a *per se* rule that directors without ownership interests cannot assert the corporation's contract rights in a § 225 action, particularly to declare so in this case, which involves a closely-held company. Such a *per se* rule might well be inequitable, especially in a situation with a large and disaggregated minority,[3] and would not rest on a distinction between directors and stockholders made by the language of § 225 itself.

However, I believe it might well be proper to deny standing to the plaintiffs to rely upon the 1987 Agreement (or to grant judgment on the merits to the defendants) in this action if the facts show that there is no circumstance in which the right of first refusal contained in the 1987 Agreement would be valuable to EMS and its shareholders. The pleadings in this matter give me no basis to conclude that this is the case. If it is later shown, however, that the minority stockholders of EMS have notice of the transaction which made Miller the majority stockholder and have no objection, this would have a material impact on my consideration of the case. In the event of such a showing, it would be difficult to imagine how Agranoff's and Callaway's assertion of EMS' rights is motivated by fiduciary, rather than personal, concerns.

The legitimacy of concerns about the standing of the plaintiffs is heightened by the fact that this action is brought under § 225 and not as a plenary basis. I cannot rescind the transaction which made Miller a shareholder—the sellers are not even before the court.[4] The fact that this court does not have jurisdiction over the underlying contractual dispute presents no small problem. In the event that I rule that the plaintiffs should be restored to office, I would be restoring the plaintiffs to the control of a corporation in which they have no economic stake, over the objections of a purported majority holder who obtained his shares from sellers who had the voting power to remove them from office. This remedy raises troubling questions because it would not rescind the sales transaction, but would disable Miller from exercising

---

3. In this regard, I note that the parties have not addressed the possible relevance of the right of the minority stockholders to join this action as plaintiffs or to file a derivative action on behalf of EMS to compel its board to enforce the 1987 Agreement. If there has been notice to the minority, these rights might be thought adequate to protect the minority and to support a denial of standing in these circumstances where there is an evident risk that directors might be motivated by purposes not shared by the corporation or its stockholders. I invite the parties to address this issue in their pre-hearing submissions.

4. Defendants have not argued that a sales transaction such as that which made Miller "majority stockholder" is insulated from review in a § 225 action. *See Garrett v. Brown,* Del. Ch., C.A. Nos. 8423 and 8427, Berger, V.C., 1986 WL 4872 (June 13, 1986) (in a § 225 action, examining whether contract granting rights of first refusal was violated by those who took control). Defendants simply assert that because Agranoff and Callaway are neither signatories to the 1987 Agreement nor EMS stockholders, neither has standing to rely upon that Agreement.

his rights under that transaction. Could the sellers (who are not owners until the sale is rescinded) thereafter take action by consent to remove the plaintiffs? Or do the plaintiffs contend that they must remain in office until the underlying contract dispute is adjudicated? In addition to these questions, I note that a court with plenary jurisdiction would undoubtedly require a showing that EMS could and would finance a purchase on the same terms as Miller paid before issuing an order rescinding the sales transaction. Without ruling definitively on this unbriefed issue, the plaintiffs should assume that I will be reluctant to restore them to control of EMS without such a showing.

Because this motion must be based on the pleadings alone at this time, however, I cannot conclude that the individual plaintiffs lack standing to rely upon the 1987 Agreement. Upon a fuller record, I may well find that they lack such standing. Alternatively, I may find that the lack of any proper corporate purpose for enforcing the contract, while not a basis to deny plaintiffs standing, entitles defendants to judgment as a matter of law. That is, the proper way ultimately to address this situation may be to analyze whether there exists, on an objective basis, a valid corporate or shareholder interest that will be served by the enforcement of the contract. If there is not, then regardless of the subjective good faith of the plaintiffs, the contract should not serve as a basis for depriving Miller of control because enforcement of the contract would not serve any valid interest of the corporation or its stockholders. Such a merits-based approach has the virtue of enabling directors to assert corporate contractual rights which might benefit the stockholders while ensuring that directors do not usurp corporate contractual rights simply to protect their incumbency. It also avoids the judicial creation of a distinction in § 225 actions between those corporate rights upon which directors may rely and those upon which stockholders may rely; a distinction that is not made by the language of § 225 itself.

To facilitate a just resolution of this issue, I hereby order the plaintiffs to provide notice of their application to the minority stockholder(s) of EMS and encourage the parties to ascertain the position of such holders regarding the sales transaction and this action. *See* 8 *Del. C.* § 225 ("The Court may make such order respecting further or other notice of such application as it deems proper under the circumstances.").

## C. *The Defendants' Contract Argument*

■ The final argument I must deal with on this motion is defendants' contention that the 1987 Agreement's terms are plain on their face and entitle the defendants to judgment as a matter of law. The defendants' contention rests primarily on their assertion that the 1987 Agreement, via Article I, § 1.1, defines the 1984 Agreement, attached as Schedule 4.1.1 of the 1987 Agreement, as part of the 1987 Agreement. That is because § 1.1 defines "[t]his [1987] Agreement" as including "this [1987] Agreement and the accompanying schedules." Since the 1984 Agreement is part of the 1987 Agreement, defendants say that the 1987 Agreement is therefore a voting agreement and expired by operation of law in 1994. In further support of this argument, the defendants cite to instances where the parties, in amending either the 1984 or the 1987 Agreement, were clearly cognizant of the other Agreement. As such, defendants contend that they should be read as one inextricably intertwined contract.

Although I do not want to prejudge the ultimate outcome of this dispute in ruling upon this motion, I do not believe that the 1987 Agreement can be read as simplistically as the defendants would wish. Several features of the 1987 Agreement weigh against their position that the 1987 Agreement is simply a non-severable section of a large voting agreement among the parties.

First, Article 4, § 4.1. states that each of the signatories "represent[ed] and warrant[ed]" there were "no shareholders agreement[s]" among the parties "except

the existing [1984] stockholders agreement" and the other agreements attached as schedules to the 1987 Agreement. This section suggests that the inclusion of the 1984 Agreement and the other agreements as schedules to the 1987 Agreement had the limited purpose of incorporating into the Agreement for clarity's sake those other contracts which the signatories "represented and warranted" were the only other contracts among them.

Second, Article 14, § 14.3 of the 1987 Agreement provides that if "any provision or condition of this Agreement be or become[s] illegal or non-enforceable, it or they shall be considered separate and severable from the Agreement and the remaining provisions and conditions of this Agreement shall remain in force and be binding upon the parties hereto as though the said provision or provisions or conditions had never been included." A similar provision is included in § 15 of the 1991 Amendment. This expression of the parties' intent would tend to favor the view that even if the parties had incorporated the 1984 Agreement into the 1987 Agreement, the expiration of the 1984 Agreement by operation of 8 *Del. C.* § 218(c) and § 10 of the 1984 Agreement would not terminate the 1987 Agreement, which could stand on its own terms.

Finally, the 1991 Amendment cuts against defendants' reading of the contract. The defendants contend that the parties were fully cognizant of the interrelationship between the 1984 and 1987 Agreement. The defendants base this argument in part on the fact that the parties' knowledge of the relationship between the

two Agreements can be gleaned from amendments to those Agreements which reference each of the Agreements. If this is so, why would the parties have amended the 1987 Agreement to provide for a specific termination clause if they believed that the 1987 Agreement was governed by the termination clause set forth in § 10 of the 1984 Agreement? If they believed that the termination clause set forth in § 10 of the 1984 Agreement governed the 1987 Agreement, why did they not amend that section of the 1984 Agreement when they adopted the 1991 Amendment? One possible explanation is that these parties believed these agreements, while related, had independent significance and were not to be considered as one contract. The parties' choice of a different termination clause for each Agreement and the parties' decision to incorporate a severability provision in the 1987 Agreement would bolster the plausibility of this construction.[5]

In light of these features of the 1987 Agreement, I cannot conclude that the defendants' preferred reading is compelled by the Agreement's unambiguous terms. Because the defendants' motion cannot be granted unless I find initially that the 1987 Agreement is unambiguously a voting agreement and I have not so found, I need not address the defendants' arguments regarding the 1991 Amendment's effectiveness or meaning at this time. Therefore, I must deny their motion for judgment on the pleadings.[6]

### III. *Conclusion and Order*

For the foregoing reasons, I hereby deny defendants' motion for judgment on

---

**5.** There are other factors which suggest that the two Agreements cannot be read simplistically as one. For example, the 1987 Agreement was originally to be governed by the laws of Canada and the Province of Quebec, while the 1984 Agreement was governed by the laws of Delaware. It was not until the 1991 Amendment that the 1987 Agreement became governed by Delaware law.

**6.** I would encourage the parties, in their pre- and post-hearing submissions and at the hearing itself, to devote attention to the question

of what rules of construction they believe are most helpful in construing the provisions of the 1987 Agreement and to any aspects of the contracting parties' negotiations and dealings which shed light on their intentions with respect to the expiration of that Agreement. For my benefit, it would also be helpful if the parties collaborated on and presented as a joint exhibit a "red lined" version of the 1987 and 1984 Agreements reflecting how the two Agreements were amended (purportedly or otherwise) over time.

the pleadings and hereby order the plaintiffs to provide notice of their application in this action to the minority stockholders of EMS and further order the defendants to cooperate with the plaintiffs in effectuating such notice.

 ⸱ IT IS SO ORDERED.