# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KATHLEEN COYNE,          )
                                         )
      Plaintiff,          )
                                         )
      v.                )  C.A. No. 2018-0011-MTZ
                                         )
FUSION HEALTHWORKS, LLC,    )
JAMES W. SHEEHAN,        )
ANDREW M. LEITZKE,       )
SHEEHAN CHIROPRACTIC, LTD.,  )
AATJ CHIROPRACTIC, INC.,     )
                                         )
      Defendants.     )

## MEMORANDUM OPINION

Date Submitted:  January 9, 2019
Date Decided:  April 30, 2019

Kathleen Coyne, *pro se, Plaintiff*.

Josiah R. Wolcott, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, *Attorney for Defendants Fusion Healthworks, LLC, James W. Sheehan, Andrew M. Leitzke, Sheehan Chiropractic, Ltd., and AATJ Chiropractic, Inc.*

**ZURN, Vice Chancellor**

Four men formed a limited liability company to test a new business model for providing chiropractic services. Their enterprise was plagued by treachery and tragedy. One of the men committed fraud against the company and was forced out. A second declared personal bankruptcy, and then, with the third, allegedly created a competing business, looted the company, and then cancelled the company. The fourth man sued the second and third for those acts, but took his own life before that suit concluded.

The deceased member's widow has sued the company, the second and third man, and their affiliated entities. She claims she is entitled to the proceeds from the life insurance policy the LLC had taken out on her husband under an agreement among the members. The enforceability of that agreement depends on, *inter alia*, whether the LLC had dissolved before her husband's death. On the defendants' motion to dismiss, I find that the dissolution provision of the company's LLC agreement is susceptible to two reasonable interpretations. I therefore must construe the provision in favor of the plaintiff, and under that construction, her rights to the life insurance policy are not terminated by the company's dissolution. I also conclude the plaintiff states a claim for a statutory receivership.

## I.  BACKGROUND

On the pending motion to dismiss, I draw the facts from the allegations in and documents incorporated by reference or integral to the complaint.[1]  I must accept as true the complaint's well-pled factual allegations and draw all reasonable inferences from those allegations in the plaintiff's favor.[2]

### A.  The Company Is Formed As An LLC.

Christopher Coyne ("Christopher") was a pharmaceutical representative and owner of diagnostic medical imaging facilities.[3]  Through these roles, Christopher developed relationships with Delaware physicians.[4]  James Sheehan was a chiropractor in Delaware.[5]  In 2006, Christopher and Sheehan created a business plan to deliver chiropractic care by hiring chiropractors and subcontracting them to Delaware medical offices.[6]  The two started an enterprise called Fusion to execute their plan.

---

[1] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).  All citations to the Complaint are to Plaintiff's Second Amended Verified Complaint.  Docket Item ("D.I.") 25 (hereinafter "Compl.").

[2] *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[3] Compl. ¶ 9.  I refer to Kathleen Coyne and Christopher Coyne by their first names in pursuit of clarity.  I intend no familiarity or disrespect.

[4] *Id*.

[5] *Id*. ¶ 8.

[6] *Id.*

In 2007, Sheehan introduced Christopher to a friend and fellow chiropractor, Andrew Leitzke.[7] Sheehan and Christopher brought Leitzke into Fusion, and each held a one-third interest.[8] Fusion's certificate of formation as a limited liability company was filed with the Delaware Secretary of State in August 2007.[9] The company lacked an operating agreement at that time.[10]

In early 2008, Sheehan and Leitzke brought their friend Sean Maas, also a chiropractor, into Fusion.[11] Maas joined as an equal, such that each man held a twenty-five percent interest.[12] The owners formalized their agreement with a Limited Liability Company Agreement on February 14, 2008 (the "LLC Agreement").[13]

## B. Maas Betrays The Company, Leading To Litigation.

As planned, Fusion contracted with physician offices to provide chiropractic services. Through Fusion, Maas provided chiropractic services at two clinics in Wilmington.[14] The clinics succeeded and would have been profitable for Fusion had

---

[7] *Id.* ¶ 11.

[8] *Id.* ¶ 12.

[9] The Complaint pleads different filing dates in August 2007. *Id.* ¶¶ 13, 15.

[10] *Id.* ¶ 15.

[11] *Id.* ¶ 14.

[12] *Id.* ¶ 16.

[13] *Id.* ¶ 18. The LLC Agreement had an effective date of January 14, 2008.

[14] *Id.* ¶¶ 46, 47.

Maas not provided services "under his own banner."[15]  Maas kept proceeds from those services for himself, leading Fusion to sue Maas in this Court in October 2010.[16]

On May 6, 2013, Vice Chancellor Parsons ordered Maas to pay Fusion $111,000 in damages, and ruled that Maas had breached his fiduciary duties and had no valid or protectable ownership rights in the clinics.[17]  Maas has yet to pay the judgment.[18]

### C.    Christopher, Leitzke, And Sheehan Enter Into A Buy-Sell Agreement.

With Maas out of the picture,[19] Christopher, Leitzke, and Sheehan executed a "Buy-Sell Agreement" in April 2012.[20]  The Buy-Sell Agreement bound Fusion to purchase life insurance policies on each member, the proceeds of which would be used to buy the member's interest from his estate upon his death.[21]  The Buy-Sell

---

[15] *Id*. ¶ 48.

[16] *Fusion Healthworks LLC v. Sean Maas*, C.A. No. 5889-VCP.

[17] Compl. ¶¶ 52-53, Ex. E.

[18] Compl. ¶ 54.

[19] Kathleen alleges Maas was "gone" from Fusion but does not explain how.  *Id*. ¶ 55. Defendants argue Maas was removed "pursuant to a Chancery Court Order," D.I. 26 at 4 n.4, but the relevant order is dated May 6, 2013, and stripped Maas of his ownership of the clinics, not Fusion.  *See* Compl. Ex. E.  Although the parties all conducted themselves as if Maas no longer owned twenty-five percent of Fusion, that conclusion remains unexplained.

[20] Compl. ¶ 55, Ex. F.

[21] Compl. Ex. F § III.

4

Agreement identifies each member's spouse as the beneficiary of his policy, including Kathleen as the beneficiary of Christopher's policy.[22] But the Buy-Sell Agreement also identifies Fusion as "the owner and primary beneficiary of all life insurance policies," and gives Fusion the responsibility "as beneficiary, [to] promptly file claims to collect in cash the death proceeds of [] the policies" and to "pay over to the personal representative [of the deceased's estate] an amount equal to the full proceeds collected, in full payment for the deceased Stockholder's shares."[23] Fusion purchased the insurance policies.[24]

Importantly for the events that unfolded, the Buy-Sell Agreement "terminate[d] upon" Fusion's "dissolution, bankruptcy or insolvency."[25]

### D. Leitzke Declares Bankruptcy.

In August 2013, Leitzke filed a voluntary Chapter 13 petition for bankruptcy.[26] Leitzke's bankruptcy was an "Involuntary Withdrawal" under the LLC Agreement, with two consequences.[27] First, Leitzke's status changed from

---

[22] *Id.* It is not clear whether the beneficiaries listed in the Buy-Sell Agreement were listed as beneficiaries on the policies. D.I. 39 at 10.

[23] Compl. Ex. F §§ III & IV.

[24] Compl. ¶ 64.

[25] Compl. Ex. F § V.

[26] Compl. ¶ 76.

[27] *Id.* ¶ 32. Although Kathleen filed a copy of the LLC Agreement with her Complaint, Exhibit C, that copy is missing page three which defines Involuntary Withdrawal (in section 1(n)). I therefore rely on the Complaint, which quotes the provision.

Member to Withdrawn Member, and his successor, if any, became "an Interest Holder but [] not [] a Member."[28]  Second, Fusion would dissolve "unless the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, by majority vote, elect[ed] to continue the business of the Company."[29]

Kathleen alleges Leitzke's bankruptcy had three additional consequences. First, Kathleen claims Leitzke made many false statements in his bankruptcy filings and did not list his interest in Fusion.[30]  As a result, Kathleen alleges, the bankruptcy proceeding did not address Leitzke's interest in Fusion, and so there was no successor to his interest.[31]

Second, Kathleen alleges that Leitzke never disclosed his bankruptcy petition to Christopher, and that Christopher did not learn of it until January 2015.[32]  The remaining members did not vote whether to continue Fusion as permitted by the LLC Agreement.[33]  And third, although the LLC Agreement deemed Leitzke to be a Withdrawn Member after his bankruptcy filing, he continued to act as a full Member,

---

[28] Compl. Ex. C § 6.3.  6 *Del. C.* § 18-304 provides a similar default rule that "[a] person ceases to be a member of a limited liability company upon" filing "a voluntary petition in bankruptcy."

[29] Compl. Ex. C § 7.1.

[30] Compl. ¶¶ 77-83.

[31] *Id.* ¶¶ 90-92.

[32] *Id.* ¶¶ 95, 98.

[33] *Id.* ¶ 99.

6

which Kathleen contends rendered any action he took as a purported Member null and void.[34]

**E.** **Sheehan And Leitzke Deceive Christopher In Competing Against And Dissolving The Company: Christopher Sues, Then Takes His Own Life.**

Under the LLC Agreement, Christopher and the other members were to receive equal distributions.[35] Fusion stopped making distributions to Christopher in July 2013, the month before Leitzke declared bankruptcy.[36] Kathleen alleges Leitzke and Sheehan "caused Fusion to cease paying any further distributions or draws to [Christopher] after July 2013, while they continued to pay themselves handsomely and cause Fusion to pay for their personal expenses."[37] Kathleen describes these acts in detail, but they are not the basis of her claims.[38] For today, it is enough to say that Leitzke and Sheehan stopped providing information to Christopher and deceived him about the future of Fusion's business. They then created a competitor and funneled Fusion's business to themselves, at Christopher's

---

[34] *Id.* ¶¶ 94, 101, 161.

[35] *Id.* ¶ 104. Starting in 2009 and continuing through July 2013, Christopher received $198,736.26. *Id.* ¶ 103. The Members who were chiropractors also received compensation for services they provided. *Id.* ¶ 104.

[36] *Id.* ¶ 105.

[37] *Id.* ¶ 106.

[38] *Id.* ¶¶ 106-180.

expense, and stole Fusion's assets, both outright and through improper payments of personal expenses.[39]

It took Christopher time to discover these acts.[40] In December 2014, Christopher confronted Leitzke and Sheehan, and requested that they cease and desist from using Fusion's logo for their new business.[41] Shortly thereafter, Leitzke and Sheehan began winding up and liquidating Fusion. In January 2015, counsel for Leitzke and Sheehan demanded that Christopher cease all communication with his clients, as well as others associated with Fusion.[42] In February 2015, Leitzke and Sheehan adopted a dissolution plan by written consent.[43] The dissolution plan engaged an accounting firm to value Fusion.[44] On April 20, Leitzke and Sheehan again purported to act by written consent to adopt the accounting firm's valuation of Fusion ($62,000 total), to pay each member their share,[45] and to file a certificate of cancellation with the Secretary of State.[46]

---

[39] *Id.*

[40] *Id.* ¶ 144.

[41] *Id.* ¶¶ 141-143.

[42] *Id.* ¶ 154.

[43] *Id.* ¶ 157.

[44] *Id.* ¶¶ 159-160.

[45] Christopher received a check for $5,608, which represented one-third of the valuation after deducting related expenses. *Id.* ¶ 173. Christopher "refused to process the payment." *Id.* ¶ 174.

[46] *Id.* ¶ 164.

8

Christopher learned of these actions on April 22, 2015, and he quickly contested them.[47] On May 5, he sued Leitzke, Sheehan, and their affiliated entities in this Court, seeking a declaratory judgment and asserting claims for breaches of fiduciary duty, breaches of contract, and conversion.[48] Kathleen alleges that the defendants used "delay tactics" and that it took until late December 2015 for the defendants to "produce a paltry amount of" discovery.[49] According to Kathleen, that discovery confirmed that Leitzke and Sheehan "had plotted, along with the recommendation of Fusion's accountant … to close Fusion and reopen it without [Christopher]."[50]

This "caused [Christopher] substantial humiliation, grief and depression."[51] "[Christopher] fretted over how he would be able to continue to finance the litigation," as he already owed about $18,000 in legal fees.[52] Christopher's "emotional and mental state began to deteriorate rapidly."[53] Tragically, Christopher took his own life on January 18, 2016.[54]

---

[47] *Id.* ¶ 156.

[48] *Id.* ¶ 182; *see Coyne v. Sheehan*, C.A. No. 10984-VCMR.

[49] Compl. ¶¶ 183, 187.

[50] *Id.* ¶ 188.

[51] *Id.* ¶ 189.

[52] *Id.* ¶ 190.

[53] *Id.* ¶ 191.

[54] *Id.* ¶ 192.

9

Pursuant to the Buy-Sell Agreement, Fusion had paid the premiums on Christopher's life insurance policy.[55] The Buy-Sell Agreement provided that Fusion would pay the proceeds to the personal representative of the decedent's estate "in full payment for the deceased Stockholder's" interests, and identified each member's spouse as the ultimate beneficiary of each life insurance policy.[56] After Christopher's death, the insurance company paid Fusion the proceeds of the policy, but Fusion has not paid those proceeds to Christopher's estate (the "Estate").[57] According to Kathleen, the Estate did not have the financial resources to continue litigating Christopher's case, and voluntarily dismissed its claim without prejudice on August 16, 2017.[58]

## F.     Kathleen Sues In Pursuit Of Life Insurance Proceeds.

Kathleen, who is Christopher's heir but not the executor of the Estate, picked up the fight by filing this suit, *pro se*, on January 8, 2018. In her operative complaint, she asserts four causes of action against defendants Fusion Healthworks, LLC; Sheehan; Leitzke; Sheehan Chiropractic, Ltd.; and AATJ Chiropractic, Inc. (together, "Defendants"). First, she seeks a declaratory judgment that (1) "the Buy

---

[55] *Id.* ¶ 198.

[56] Compl. Ex. F § IV.

[57] D.I. 39 at 10; *see also* Compl. ¶¶ 199-200.

[58] Compl. ¶ 215.

10

Sell [Agreement] was not terminated at the time of [Christopher's] death on January 18, 2016" and (2) "the Buy Sell [Agreement] is enforceable among the parties."[59] Second, she seeks the appointment of a receiver to protect Fusion's assets.[60] Third, she alleges Leitzke and Sheehan breached the Buy-Sell Agreement by withholding the life insurance proceeds.[61] Fourth and finally, Kathleen requests an order of specific performance ordering Defendants to pay the insurance proceeds to the Estate, of which Kathleen is an heir.[62]

Defendants moved to dismiss for failure to state a claim on May 11, 2018. The case was reassigned to me on October 4, and I heard oral argument on the fully briefed motion on January 9, 2019.

## II. ANALYSIS

The standards that normally apply to reviewing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [iv] dismissal is inappropriate

---

[59] *Id.* ¶ 220.

[60] *Id.* ¶¶ 223-232.

[61] *Id.* ¶¶ 233-243.

[62] *Id.* ¶¶ 244-251.

unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[63]

Because Kathleen is *pro se*, she is "held to a somewhat less stringent technical standard than formal pleadings drafted by lawyers, and [her Complaint] is dismissed for failure to state a claim only if it appears that [she] can prove no set of facts … which would entitle [her] to relief."[64]

Questions of contractual interpretation are generally questions of law that are appropriate for a motion to dismiss.[65] But the Court cannot choose between reasonable interpretations of ambiguous contract provisions at this stage.[66] "Dismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[67] Ambiguity exists when the provision in controversy is reasonably or fairly susceptible of different

---

[63] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[64] *Browne v. Robb*, 583 A.2d 949, 959 (Del. 1990); *see also Sloan v. Segal*, 2008 WL 81513, at *7 (Del. Ch. Jan. 3, 2008) (stating court may hold "*pro se* filings to 'a somewhat less stringent technical standard' than those drafted by lawyers" (quoting *Vick v. Haller*, 522 A.2d 865, 1987 WL 36716, at *1 (Del. 1987) (TABLE))); *Batchelor v. Alexis Props., LLC*, 2018 WL 5919683, at *7 (Del. Super. Ct. Nov. 13, 2018) ("Cognizant of the difficulties faced by *pro se* Plaintiffs, this Court holds a *pro se* Plaintiff's complaint to a less demanding standard of review.").

[65] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[66] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[67] *Id.*

interpretations.[68] "An unreasonable interpretation [of a contract] produces an absurd result or one that no reasonable person would have accepted when entering the contract."[69] Where the provision is susceptible to more than one reasonable interpretation, for purposes of deciding a motion to dismiss, its meaning must be construed in the light most favorable to the non-moving party.[70]

I address Kathleen's declaratory judgment, breach of contract, and specific performance claims based on the Buy-Sell Agreement together, before turning to her claim for a receiver.

### A. Kathleen Has Adequately Pled The Buy-Sell Agreement Did Not Terminate Due To Leitzke's Bankruptcy.

### 1. Kathleen Has Pled She Is A Third Party Beneficiary.

As an initial matter, the parties dispute Kathleen's standing to bring contractual claims as a third party beneficiary to the Buy-Sell Agreement. She was not a party to the Buy-Sell Agreement, and so will need to establish she has standing to enforce the contract as a third party beneficiary.[71] To do so, Kathleen must show

> (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been

---

[68] *Id.*

[69] *Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[70] *VLIW Tech.*, 840 A.2d at 615.

[71] *See Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 268 (Del. Ch. 1987) ("Analysis of the standing issue begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party.").

13

intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.[72]

For the first element, Kathleen has adequately pled that the parties intended for her to benefit from the Buy-Sell Agreement, even if indirectly through the Estate. The Buy-Sell Agreement required Fusion to pay insurance proceeds to the Estate.[73] And Kathleen has pled that she is an heir to the Estate, and that she is named in the Buy-Sell Agreement as the intended beneficiary of Christopher's policy.[74]

To satisfy the second element, that benefit must be either in satisfaction of a pre-existing obligation to that person, or a gift. The Second Restatement of Contracts describes these categories as follows: "(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."[75] As an example of a gift, the Restatement describes the purchase of life insurance: "A, an insurance company, promises B in a policy of

---

[72] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

[73] Compl. Ex. F §§ III, IV.

[74] Compl. ¶¶ 67, 205.

[75] Restatement (Second) Contracts § 302 (1981). This Court has previously cited this section of the Restatement. *See Madison Realty*, 2001 WL 406268, at *5; *Insituform of N. Am.*, 534 A.2d at 268.

insurance to pay $10,000 on B's death to C, B's wife.  C is an intended beneficiary

…."[76]  Performance need not be "rendered directly to" the third party beneficiary.[77]

Here, the parties to the Buy-Sell Agreement agreed the life insurance proceeds would be used to buy their interests in Fusion from their estates after their deaths. Neither the pleadings nor the parties have provided any basis to conclude that this agreement satisfied any pre-existing obligation to the members' estates or any person.  Rather, it appears the promised performance – purchase of the deceased member's Fusion interest for $1 million – would benefit the deceased member's estate and heirs by purchasing the member's interest in Fusion at a generous valuation.[78]  It is reasonably conceivable that Fusion's agreement to pay the $1 million to a member's estate, in the context of an identified intended beneficiary, reflects an intent to give that beneficiary the benefit of the promised performance.[79]

---

[76] *Id*. cmt. c illus. 4.

[77] *Id*. cmt c.

[78] The pleadings do not reflect the value of a one-third interest in Fusion at the time the parties entered into the Buy-Sell Agreement.  An accounting firm valued Fusion at $62,000 in 2015, which supports an inference that the $1 million price for a one-third interest was intended to provide some benefit to a decedent's estate beyond the value of the one-third interest.  And while Fusion and the remaining members benefited from this exchange by repurchasing the decedent's interest, the cost of doing so at a premium was borne in part by the insurance company, not Fusion or the Members.

[79] *See In re Hillowitz' Estate*, 238 N.E.2d 723, 725 (N.Y. 1968) (stating partnership agreements that pay deceased partner's spouse for partnership interest upon partner's death "are, in effect, nothing more or less than third-party beneficiary contracts, performable at death").

The third and final element requires the intent to benefit the third party to be a material part of the parties' purpose in entering into the contract. The Buy-Sell Agreement states its purpose was "(1) to provide for the sale by a deceased Stockholder's Estate, of his interest … and for the purchase of such interest … at redemption of life insurance policy; and (2) to provide all or a substantial part of the funds for the purchase."[80] I conclude Kathleen has pled she has standing to pursue her claims under the Buy-Sell Agreement as a third party beneficiary.

### 2. It Is Reasonably Conceivable The Buy-Sell Agreement Remained In Effect At The Time Of Christopher's Death.

In order for Kathleen's claims under the Buy-Sell Agreement to survive Defendants' motion, it must be reasonably conceivable that the Buy-Sell Agreement survived Fusion's tumultuous history. Specifically, it must be reasonably conceivable that the Buy-Sell Agreement survived Leitzke's bankruptcy. Defendants assert that bankruptcy triggered Fusion's dissolution, which in turn terminated the Buy-Sell Agreement.

Under its own terms, the Buy-Sell Agreement terminates upon Fusion's dissolution.[81] The Buy-Sell Agreement thus incorporated the LLC Agreement by reference, at least implicitly, for the limited purpose of determining whether Fusion

---

[80] Compl. Ex. F.

[81] *Id* § V.

16

dissolved.[82]  The LLC Act provides that an LLC Agreement is the primary source

for defining the terms of dissolution.[83]  Members of an LLC can agree that the LLC

"is dissolved and its affairs shall be wound up upon … the happening of events

specified in a limited liability company agreement."[84]  "[S]uch specified events that

cause a Delaware limited liability company to dissolve may include occurrences,

such as the bankruptcy of a member, that as a default rule under the DLLC Act do

not otherwise cause dissolution."[85]

---

[82] *See 11 Williston on Contracts* § 30:26, Westlaw (updated November 2018) ("Moreover, reference to a prior writing may be essential to the interpretation and construction of a later contract when, even though the writings in question were neither executed at the same time, nor made by the same parties, the multiple writings are so clearly and closely related to the same transaction that the meaning of the later writing, at the time when and the place where it was made, can only be understood by referring to the earlier writing."); *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 456 (Del. Ch. 1967) ("When an executed contract refers to another instrument and makes the conditions of the other instrument a part of it, the two will be interpreted together as the agreement of the parties."), *aff'd*, 239 A.2d 629 (Del. 1968); *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 219 (1st Cir. 2006) ("Under general principles of contract law, a contract that does not explicitly incorporate another agreement may nonetheless implicitly incorporate that agreement."); *see also CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009) ("Traditionally, courts try to give a consistent reading to interrelated agreements."), *aff'd*, 8 A.3d 1143 (Del. 2010).

[83] The first and second sections of § 18-801 allow drafters of an LLC Agreement to set a time when the LLC will dissolve, or define "the happening of events" that will cause dissolution.  6 *Del. C.* § 18-801(a)(1) & (2).

[84] 6 *Del. C.* § 18-801(a)(2).

[85] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 16.02[B], at 16-7 (2018 Supp.).

Under Fusion's LLC Agreement, Leitzke's bankruptcy filing precipitated his Involuntary Withdrawal.[86] Upon Leitzke's withdrawal, Section 7.1.2 of Fusion's LLC Agreement provided that unless a majority of the remaining members voted to continue the business of Fusion, Fusion would dissolve after ninety days:

> The Company shall be dissolved … upon the occurrence of an Involuntary Withdrawal of a Member, unless the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, by majority vote, elect to continue the business of the Company.[87]

The Members did not vote on whether Fusion should continue, and Christopher did not know he needed to do so.[88]

The parties offer conflicting interpretations of Section 7.1.2. Defendants argue that Fusion dissolved in the absence of a vote, regardless of whether the remaining members held an election. Kathleen reads the provision to require an election before Fusion could dissolve.[89] For Defendants to prevail on their motion to dismiss, their interpretation of Section 7.1.2 must be the only reasonable construction as a matter of law.[90]

---

[86] Compl. ¶ 32.

[87] Compl. Ex. C §§ 7.1, 7.1.2.

[88] Compl. ¶¶ 95, 98; D.I. 27 ¶ 10.

[89] D.I. 30 ¶ 72.

[90] *See VLIW Tech.*, 840 A.2d at 615.

In my view, both interpretations of Section 7.1.2 appear reasonable at this stage. Defendants' interpretation fairly tracks the plain language of the provision: the Company "shall" be dissolved "upon the occurrence of an Involuntary Withdrawal," unless the remaining members affirmatively act to stop dissolution by electing to continue the business within ninety days. But Defendants' interpretation produces a result that is arguably absurd. It places Fusion's fate in the hands of a Withdrawn Member, rather than the hands of the remaining members, particularly when that Withdrawn Member does not disclose his withdrawal.[91] This is inconsistent with Fusion's managerial framework, which otherwise vests authority solely in members in good standing. Under the LLC Agreement, Withdrawn Members are no longer Members and have no right to manage the Company[92] or vote on actions presented to the Members.[93] Shifting managerial power over

---

[91] Kathleen alleges just such an instance of a Withdrawn Member directing Fusion's fate. Leitzke did not tell Christopher about his bankruptcy. In early 2015, Leitzke and Sheehan used Christopher's ignorance to their advantage and proceeded to wind up and cancel Fusion as if Leitzke were still a member in good standing. But years later, in this case, Leitzke seeks to use the absence of a vote to his advantage, arguing that his clandestine withdrawal caused Fusion to dissolve in 2013, ninety days after his bankruptcy.

[92] Compl. Ex. C § 5.1.1 ("The business and affairs of the Company shall be managed by the Members.").

[93] *See id*. § 5.2 (detailing procedures for "Meetings of and Voting by Members").

19

dissolving the LLC to a Withdrawn Member is inconsistent with the rest of Fusion's managerial scheme and is an arguably absurd result.[94]

Where Defendants see an opportunity for a vote, Kathleen sees a requirement. She interprets Section 7.1.2 to require an election among the remaining members before Fusion could dissolve.[95] Under this reading, the remaining members retain control over Fusion's dissolution. Such control is consistent with Section 6.3, which deprives the Withdrawn Member of any control over the company by shifting his interest to his successor "[i]mmediately upon the occurrence of an Involuntary Withdrawal," and specifies that successor has fewer rights than a Member. It is also consistent with Sections 7.2 and 7.3, under which the remaining members are charged with winding up the Company's affairs and filing the certificate of cancellation. Kathleen's interpretation better harmonizes Section 7.1.2 with the remainder of the LLC Agreement, but requires a less straightforward reading of the text.

---

[94] *See Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *2009 Caiola Family Trust v. PWA, LLC*, 2014 WL 1813174, at *9-11 (Del. Ch. Apr. 30, 2014) (finding that an interpretation of an operating agreement giving non-managing members with limited authority the unilateral right to make major decisions would produce arguably absurd results).

[95] Compl. ¶ 99; D.I. 30 ¶ 57.

I conclude that Defendants' interpretation of Section 7.1.2 is not the only reasonable one, and therefore must interpret that ambiguous provision in the light most favorable to Kathleen for purposes of this motion. Kathleen has adequately pled that the Buy-Sell Agreement survived Leitzke's bankruptcy.

As an alternative argument to Leitzke's bankruptcy causing Fusion's dissolution, Defendants assert Leitzke and Sheehan effectively dissolved, wound up, and cancelled Fusion in early 2015, such that the Buy-Sell Agreement still terminated prior to Christopher's death. But this argument ignores the undisputed fact that Leitzke filed for bankruptcy and immediately became a Withdrawn Member. It is thus reasonably conceivable that the actions Leitzke and Sheehan took to dissolve, wind up, and cancel Fusion in early 2015 were not effective, such that the Buy-Sell Agreement was in effect when Christopher died. I conclude Kathleen can pursue Counts I, III, and IV as a third party beneficiary.

**B.      Kathleen Has Stated A Claim For A Receiver.**

Kathleen requested a receiver for the pendency of this litigation.[96] But she made that request under 6 *Del. C.* § 18-805, which authorizes any person showing good cause to secure the appointment of a trustee or receiver for a terminated LLC.

---

[96] Compl. ¶ 228.

That Section provides:

> When the certificate of formation of any limited liability company formed under this chapter shall be canceled by the filing of a certificate of cancellation pursuant to § 18-203 of this title, the Court of Chancery, on application of any creditor, member or manager of the limited liability company, or any other person who shows good cause therefor, at any time, may either appoint 1 or more of the managers of the limited liability company to be trustees, or appoint 1 or more persons to be receivers, of and for the limited liability company, to take charge of the limited liability company's property, and to collect the debts and property due and belonging to the limited liability company … and to do all other acts which might be done by the limited liability company, if in being, that may be necessary for the final settlement of the unfinished business of the limited liability company. The powers of the trustees or receivers may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid.

The purpose of Section 18-805 "is to benefit [equity]holders and creditors where there are undisposed of assets remaining after dissolution by allowing appointment of a receiver 'to safeguard the collection and administration of still existing property interests of a dissolved'" LLC.[97] The appointment of a receiver under this Section is an independent statutory cause of action, not an equitable remedy.[98]

---

[97] *In re Dow Chem. Int'l Inc.*, 2008 WL 4603580, at *1 (Del. Ch. Oct. 14, 2008) (quoting *In re Citadel Indus., Inc.*, 423 A.2d 500, 506 (Del. Ch. 1980)). The LLC Act "tracks closely" the analogous provision in Delaware's General Corporation Law, 8 *Del. C.* § 279. *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp.*, 2010 WL 3448227, at *5 (Del. Ch. Sept. 2, 2010); *see Matthew v. Laudamiel*, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("Since the wording and context of these two statutory provisions are essentially identical, authorities interpreting § 279 are persuasive when interpreting § 18-805.").

[98] *CML V, LLC v. Bax*, 6 A.3d 238, 252 (Del. Ch. 2010) (noting the application for receiver under Section 18-805 is different than the "common law right to apply for a receiver"), *aff'd*, 28 A.3d 1037 (Del. 2011); *see also Ross Hldg.*, 2010 WL 3448227 at *6 (analyzing whether to appoint receiver under both statute and equitable powers). Defendants'

22

It is reasonably conceivable that the facts as alleged warrant a receiver. Fusion filed a Certificate of Cancellation with the Secretary of State on April 20, 2015.[99] Kathleen, as an heir to Christopher's Estate under his will, has pled good cause justifying her application.[100] After Fusion was cancelled, someone acted to claim and collect the proceeds of Fusion's life insurance policy on Christopher's life, and Fusion continues to hold those proceeds.[101] Kathleen alleges the Estate cannot be closed, and cannot pay its federal estate taxes or distribute its assets to its heirs, due to the delay in receiving Christopher's life insurance proceeds.[102] And Kathleen has alleged Leitzke and Sheehan have a long history of mishandling Fusion's assets. I conclude Kathleen has pled a claim for a receiver under Section 18-805.[103]

---

argument that the equitable appointment of a receiver "is an extraordinary remedy" does not affect Kathleen's statutory right to a receiver. *See* D.I. 27 ¶ 18.

[99] Compl. ¶ 164, Ex. T.

[100] Compl. ¶ 205.

[101] D.I. 39 at 10; *see also* Compl. ¶¶ 199-200.

[102] Compl. ¶¶ 203-205.

[103] *See Techmer Accel Hldgs., LLC v. Amer*, 2010 WL 5564043, at *12 (Del. Ch. Dec. 29, 2010) (granting motion for summary judgment and finding good cause where limited partnership "retained assets and had outstanding liabilities when it cancelled its certificate of limited partnership"). Section 17-805 contains the same language as Section 18-805, and "when addressing an LLC case and lacking authority interpreting the LLC Act, this court often looks for help by analogy to the law of limited partnerships." *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 n. 33 (Del. Ch. Apr. 20, 2009); *see also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) (stating "architecture and much of [LLC Act's] wording is almost identical to that of the Delaware LP Act").

23

Defendants point to Kathleen's claim that Fusion was improperly cancelled as grounds for denying her request for a receiver. Defendants argue Kathleen cannot claim the certificate of cancellation is invalid while seeking a receiver under Section 18-805, which requires a certificate of cancellation.[104] But even if "grounds may also exist for nullification of [the] certificate of cancellation, the appointment of a receiver under" Section 18-805 can provide the necessary relief.[105] I do not read Kathleen's *pro se* provision of context, and her alternative request to nullify the certificate of cancellation, to deprive her of a claim under Section 18-805.[106]

## III. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is DENIED. Counsel for Defendants should work with Kathleen to contact chambers for available dates for a scheduling conference.

**IT IS SO ORDERED.**

---

[104] Defendants cite *Trusa v. Nepo*, 2017 WL 1379594 (Del. Ch. Apr. 13, 2017) and argue that a claim for a receiver under Section 18-805 must be dismissed if Fusion was not cancelled. D.I. 27 at 11 n.12; D.I. 32 at 10 n.6. *Trusa* does say that "a certificate of cancellation is a statutory prerequisite to the applicability of section 18-805." 2017 WL 1379594 at *7. But there, the LLC had "been cancel[l]ed by operation of law for want of a registered agent." *Id.* Because "the filing of a certificate of cancellation and the automatic cancellation of a certificate of formation are treated differently" for purposes of appointing a receiver under Section 18-805, the Court could not appoint a receiver. *Id.* In this case, Defendants filed a certificate of cancellation. *Trusa* thus supports a request for a Section 18-805 receiver here.

[105] *Techmer*, 2010 WL 5564043, at *12.

[106] *See* Ct. Ch. R. 8(a); (e)(2).